# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **Checker Cab Philadelphia, et al,**<br>    **Plaintiffs,**<br><br>    v.<br><br>**The Philadelphia Parking Authority and Vincent Fenerty,**<br>    **Defendants.** | **CIVIL ACTION**<br><br>**NO. 16-4669** |

## MEMORANDUM RE: MOTIONS TO DISMISS

### I. Introduction

This case was filed by over 300 Philadelphia medallion-holding taxi cab operators ("Medallion Plaintiffs," or "Plaintiffs") against the Philadelphia Parking Authority ("PPA") and its former Executive Director under the Equal Protection Clause and Takings Clause of the United States Constitution. Their claims relate to the entry of Transportation Network Companies ("TNCs"), such as Uber and Lyft, into the for-hire transportation market. After Plaintiffs filed suit, a non-medallion holding taxi company, Germantown Cab Company ("Intervenor") intervened. Pending before the Court are two motions brought by Defendants under Rule 12(b)(6), for failure to state a claim:

(1) Defendants' Motion to Dismiss the Medallion Plaintiffs' Amended Complaint; and

(2) Defendants' Motion to Dismiss Intervenor's Second Amended Complaint.

Following substantial briefing and argument, the Court will deny the pending Motions to Dismiss in part and grant them in part.

## II. Factual and Procedural Background

a. Overview

TNCs are technology-based transportation companies that enable a customer to arrange a ride with a driver via smartphone application. Two well-known TNCs are Uber Technologies, Inc. ("Uber") and Lyft, Inc. ("Lyft"). TNCs first entered the Philadelphia market in October 2014 and have increasingly become widespread as an alternative service to traditional taxi cabs. Medallion Am. Compl. (ECF 70) at ¶ 4. Plaintiffs allege that because of PPA's immense regulatory burden on Philadelphia taxis, and no regulation as to TNCs, the TNCs were able to market themselves as "better, faster, and cheaper" than a taxi. Medallion Am. Compl. ¶ 11. Plaintiffs allege that at least in part as a result of that, TNCs grew in popularity, at the expense of taxicab operators such as Plaintiffs. Medallion Am. Compl. ¶ 11. Plaintiffs' claims are based on the disparity in treatment between taxis and TNCs. Plaintiffs allege that Defendants violated their constitutional rights by simultaneously enforcing strict regulations on taxis and failing to regulate TNCs at all, and are liable for damages.

b. Regulatory Scheme and History

In 1947, the Pennsylvania General Assembly enacted the Parking Authorities Law ("PAL"), which created municipal parking authorities. Blount v. Philadelphia Parking Auth., 600 Pa. 277, 278 (2009). In 2004, the General Assembly amended Title 53 of the PAL to give the Philadelphia Parking Authority ("PPA")—as opposed to the Pennsylvania Public Utility Commission ("PUC")—the responsibility of regulating taxicab and limousine services in Philadelphia. See 53 Pa. C.S. §§ 5701–5745 (these statutes are commonly referred to as Act 94); Bucks County Servs, Inc. v. Philadelphia Parking Auth., 71 A.3d 379, 383 (Pa. Commw. Ct. 2013) ("Act 94 transferred jurisdiction over taxicab service within the City from the Commission to the Authority").

Specifically, Act 94 lists one of the "purposes and powers" of the PPA as being "to act as an independent administrative commission for the regulation of taxicabs and limousine service." 53 Pa. C.S. § 5505(23). It further gives the PPA the power to "prescribe such rules and regulations as it deems necessary to govern the regulation of *taxicabs* within cities of the first class under this chapter." 53 Pa. C.S. § 5722 (emphasis added); see also 53 Pa. C.S. § 5742 (using the same language to allow the PPA to regulate "limousine service").

Act 94 defines "taxicab" as:

> "[a] motor vehicle designed for carrying no more than eight passengers, exclusive of the driver, on a call or demand service basis and used for the transportation of persons for compensation either on:
>
> (1) A citywide basis as authorized by a certificate of public convenience and a corresponding medallion issued by the authority; or
>
> (2) A non-citywide basis as authorized by a certificate of public convenience issued by the authority and without a corresponding medallion."

Act 94 defines "call or demand service" or "taxicab service" as:

> "Local common carrier service for passengers, rendered on either an exclusive or nonexclusive basis, where the service is characterized by the fact that passengers normally hire the vehicle and its driver either by telephone call or by hail, or both. The term does not include limousine service."

53 Pa. C.S. § 5701.[1]

Under Act 94, medallions are defined as property rights that cannot be revoked or cancelled. 53 Pa. C.S. § 5713. In addition, the statute limits the number of taxi medallions that can be issued by the PPA to 1,600 medallions. 53 Pa. C.S. § 5711.

In 2005, pursuant to Act 94 and its delegation of legislative authority, the PPA promulgated its first set of taxicab and limousine regulations. 53 Pa. C.S. §§ 5722, 5742; Bucks

---

[1] One important legal issue is whether this language covers TNCs. Although the technology used by TNCSs was not developed at the time this statute was enacted, the TNC rides are initiated via "smartphone" which may be included in the term "telephone" in the statute.

3

County Servs., Inc., 71 A.3d 379, 383. In 2011, the PPA promulgated the regulations that are currently operative. See 52 Pa. Code §§ 1011, et seq.

In November 2016, the Pennsylvania General Assembly passed legislation granting TNCs permanent legal authority to operate throughout Pennsylvania, including within Philadelphia. This legislation has been referred to as Act 164. Act 164 lessens certain regulations on taxi cabs, and requires TNCs to pay assessments of 1.4% of gross revenues in Philadelphia to the PPA. Act 164 also directs the PPA to enact a new set of regulations governing for-hire transportation in Philadelphia to be inclusive of TNCs.

    c. Procedural History

        *1. Preliminary Injunction Phase*

Medallion Plaintiffs initially filed suit on August 26, 2016. (ECF 1). On September 1, 2016, Medallion Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction. (ECF 2). This Court held evidentiary hearings relating to the Preliminary Injunction Motion on September 28, 2016, September 29, 2016, and October 4, 2016. Several of Medallion Plaintiffs' and Defendants' witnesses testified and were subject to cross-examination at the evidentiary hearing. Before the Court could decide the Motion, the Parties were able to reach an agreement as a result of substantial discussions facilitated by Magistrate Judge Rice. Therefore, the injunction issues are resolved and are no longer before the Court.

        *2. Intervenors*

Two proposed intervenors, Bucks County Services and Germantown Cab Company, filed Motions to Intervene on September 19, 2016 and September 21, 2016, respectively. (ECF 17, ECF 20). This Court granted both motions on October 4, 2016. (ECF 41). Neither intervenor

filed a Preliminary Injunction motion.[2] On November 14, 2016, Bucks County Services voluntarily withdrew its complaint, leaving just one intervenor in the case. (ECF 71).

### 3. *Motions to Dismiss*

There are two operative Complaints in this case: the Medallion Plaintiffs' Amended Complaint, filed November 4, 2016 ("Medallion Amended Complaint", ECF 70), and Germantown's Second Amended Complaint, filed January 4, 2017 ("Intervenor Complaint", ECF 89).

The Medallion Amended Complaint advances three claims:

- Count I: Equal Protection claim
- Count II: Takings Clause and Due Process claim
- Count III: Declaratory Judgment claim [resolved]

The Intervenor Complaint advances five claims:

- Counts I-III: Equal Protection claims
- Count IV: Declaratory Judgment claim regarding Act 164
- Count V: Preliminary Injunctive Relief [withdrawn]

Defendants filed a Motion to Dismiss the Medallion Amended Complaint on November 17, 2016. (ECF 74). Medallion Plaintiffs responded on December 1, 2016, Defendants replied on December 13, 2016, and Medallion Plaintiffs filed a surreply on December 23, 2016. (ECF 80, ECF 84, ECF 87). Defendants filed supplemental memoranda updating the court on recent relevant case law on January 20, 2017, January 23, 2017, and March 13, 2017. (ECF 98, ECF 99, ECF 120).

---

[2] Intervenor includes a claim for a Preliminary Injunction in its Complaint, but at oral argument counsel for Intervenor stated on the record that his client was no longer seeking preliminary injunctive relief.

5

Defendants filed a Motion to Dismiss the Intervenor Complaint on January 20, 2017. (ECF 96). Intervenor responded on February 17, 2017. (ECF 115). Defendants replied on March 3, 2017. (ECF 116). In addition, the Medallion Plaintiffs filed a memorandum in partial support of Defendants' Motion to Dismiss the Intervenor's complaint, which the Intervenor moved to strike. (ECF 107, ECF 114). The Court held Oral Argument on Defendants' Motion to Dismiss on May 18, 2017.

### III. Legal Standard

A motion to dismiss for failure to state a claim tests the sufficiency of a complaint. Fed. R. Civ. P. 12(b)(6); Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In evaluating a motion to dismiss, the court must view factual allegations in a light most favorable to the plaintiff, drawing all reasonable inferences therefrom. Buck v. Hamilton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2002). Taking the well-pleaded facts as true, the court must determine whether the plaintiff is "plausibly" entitled to relief. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). That is, the pleadings must contain enough factual content to allow a court to make "a reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 679. In short, a complaint must not only allege entitlement to relief, but must also demonstrate such entitlement with sufficient facts to push the claim "across the line from conceivable to plausible." Id. at 683; accord Holmes v. Gates, 403 F. App'x 670, 673 (3d Cir. 2010).[3]

---

[3] Counsel for Defendants took the position at oral argument that the Plaintiffs had to meet a higher pleading standard, and refute all conceivable rational bases for the disparity in treatment. This principle applies only where the classification at issue was made by statute or by regulation, and where the decision maker has advanced a rational basis for the difference. Cf. United States v. Walker, 473 F.3d 71, 77 (3d Cir. 2007) (noting that legislative decision making should be given deference and presumed rational); see also Newark Cab Assoc. v. City of Newark, 2017 WL 214075 (D.N.J. Jan. 18, 2017) (articulating same standard applicable to statutory and regulatory exercises of discretion). Here, Medallion Plaintiffs do not challenge a statutory or

### IV. Parties' Positions

a. <u>Plaintiffs' Allegations</u>

Medallion Plaintiffs allege that TNCs are "de facto taxicabs" because they provide the "exact same service" as traditional medallion taxicabs. Medallion Am. Compl. ¶¶ 27-29. Medallion Plaintiffs allege that the PPA violated their constitutional rights by heavily regulating traditional taxicabs and failing to regulate the TNCs altogether. Id. ¶¶ 67-70. The Medallion Plaintiffs allege that by taking the position that the TNCs were illegally operating, but failing to credibly enforce that position, PPA allowed the TNCs to operate within Philadelphia free from regulatory burden. Id. ¶¶ 55-57. Plaintiffs allege that PPA's failure to regulate the TNCs violated their Equal Protection rights, and constituted an unconstitutional taking of their medallion property rights, as conferred by 53 Pa. C.S. § 5713.

Critical to the Medallion Plaintiffs' position is their allegation that under 53 Pa. C.S. § 5701, which gives the PPA the right to regulate "call or demand" transportation service, the PPA had the ability to regulate the TNCs. Plaintiffs allege that PPA arbitrarily decided *not* to regulate the TNCs at all, largely turned a blind-eye to the TNCs "illegal" operations, and simultaneously stringently enforced PPA's regulations against the taxicabs. This allegedly arbitrary disparate treatment forms the basis of Plaintiffs' equal protection claim.

b. <u>Intervenor's allegations</u>

Intervenor Germantown Cab Company is a non-medallion taxi company that operates with limited rights in the City of Philadelphia. Intervenor Comp. ¶ 1. As a non-medallion taxi company, Intervenor is not permitted to complete trips that begin and end within Philadelphia, with the exception of a limited area of the city. Id. In its complaint, Intervenor advances the

---

regulatory scheme, and PPA does not offer a rational basis for the disparate treatment – PPA instead argues that the two groups were not similarly situated and were not differently treated.

same type of allegations as the Medallion Plaintiffs, but adds additional theories of equal protection violations that post-date the enactment of Act 164. Id. at ¶¶ 62-81. For example, Intervenor alleges that the PPA is violating its Equal Protection rights by allowing TNCs to operate throughout Philadelphia pursuant to Act 164, but not allowing Germantown to do the same. Id. at ¶ 73. Further, Intervenor seeks a declaratory judgment that Act 164 itself is unconstitutional because it is illegal special legislation and grants TNCs Philadelphia operating rights that Germantown does not have, and lessens regulatory burden on Philadelphia medallion taxi cabs that does not apply to non-medallion limited rights holders. See id. at ¶¶ 94-111.

   c. Defendants' Arguments

Defendants argue that they did not treat TNCs preferentially to taxicabs. Defendants argue that the PPA did not have the authority to create regulations applicable to TNCs under Pennsylvania law, and that TNCs were operating illegally in Philadelphia despite the PPAs efforts to prevent them from doing so. In addition, Defendants cite cases from several jurisdictions which have been brought by taxi companies alleging similar equal protection violations.[4] Defendants argue that these cases stand for the proposition that TNCs and taxicabs are not similarly situated, so Plaintiffs' claims are insufficient as a matter of law.

V. Analysis

   a. Equal Protection

The Parties discuss several cases (such as the ones cited in Footnote 4, supra) from jurisdictions addressing whether a traditional taxicab owner or driver is entitled to judicial relief because of preferential treatment shown to TNCs. In almost all of these cases, plaintiffs

---

[4] Examples of these cases include: Illinois Transp. Trade Ass'n v. City of Chicago, 134 F. Supp. 3d 1108 (N.D. Ill. 2015) aff'd in part, rev'd in part, 839 F.3d 594 (7th Cir. 2016), cert. denied (U.S. Apr. 24, 2017); Newark Cab Ass'n v. City of Newark, 2017 WL 214075 (D.N.J. Jan. 18, 2017); Gebresalassie v. D.C., 170 F. Supp. 3d 52 (D.D.C. 2016).

taxicabs' equal protection claims were based on the disparity between two regulatory frameworks that were allegedly unequal. That is, the municipality had instituted one set of regulations applicable to traditional taxicabs and another set of regulations applicable to TNCs. The traditional taxicabs objected to the disparate treatment between the two groups, and advanced equal protection claims asserting that the disparity in treatment was not rationally related to a legitimate policy goal. In such cases, where there were two regulatory schemes in place, the courts analyzed each difference in treatment between the two schemes, and determined whether there was a rational basis for the disparity.

This type of analysis is not controlling here on a Motion to Dismiss, because Medallion Plaintiffs allege that the PPA arbitrarily failed to regulate the TNCs altogether. There is no separate scheme to analyze, and no rational basis has been advanced for the PPA's failure to regulate the TNCs. Instead, Defendants maintain that they did not have the authority to regulate the TNCs and have taken the position that the TNCs were operating illegally in Philadelphia. Plaintiffs allege that the PPA failed to enforce this position, and failed to take any substantial action against the TNCs, instead allowing the TNCs to operate free of regulation and free from enforcement actions.

One case that contains similar allegations, and can provide a precedent for the Court's analysis here, is Judge Gorton's opinion in Boston Taxi Owners Ass'n, Inc. v. City of Boston, 180 F. Supp. 3d 108 (D. Mass. 2016) (hereinafter "Boston I"). There, the Boston Taxi Owners Association filed suit against city and state agencies in Federal District Court, alleging *inter alia* that the City and State's disparate treatment of TNC's and taxicabs violated the Fourteenth Amendment Equal Protection Clause. In Boston, the Police Commissioner was authorized by

9

state statute to regulate the taxi business within the City, and exercised that grant of authority via issuance of a comprehensive set of regulations referred to as "Rule 403." Id. at 113.

Rule 403 defines "hackney carriage" (taxicab) as "a vehicle used or designed to be used for the conveyance of persons for hire from place to place within the City of Boston." Id. Under Rule 403, taxicab operators must, among other things: possess a medallion, maintain a properly equipped and functioning taxicab, display a license, refrain from cell phone use while operating a taxicab, and belong to an approved dispatch service. Id. According to Judge Gorton, Rule 403 was not enforced in earnest against TNCs, despite the broad definition of "taxicab" in the regulation. Id. Further, the Commissioner had not yet issued regulations to specifically address TNCs, though the City of Boston had convened a Taxi Advisory Committee in October 2014 which was authorized to examine the regulatory framework and develop new policies to account for Uber and Lyft. Id.

Judge Gorton denied the City of Boston's Motion to Dismiss plaintiffs' Equal Protection claim, holding that the plaintiffs had adequately alleged an equal protection violation. Id. at 118. In so deciding, Judge Gorton held that plaintiffs had adequately alleged (1) that TNCs and taxis were "similarly situated" entities that had been treated differently, and (2) that that disparate treatment was not rationally related to a legitimate government objective. Id. at 118-119

In deciding that plaintiffs had adequately alleged that TNCs and taxis were similarly situated, Judge Gorton noted that any differences *created* by regulation could not be used to argue that the groups are dissimilar. Id. at 118. Though Judge Gorton agreed that there were some differences between the two groups – such as the fact that taxis can accept street hails and cash – the court held that for the purposes of equal protection analysis, the groups were similarly situated. Id.

In deciding that plaintiffs had adequately alleged that the disparity in treatment between the two groups was not rationally related to a legitimate government objective, Judge Gorton considered two policy goals advanced by the City to justify the disparity. Id. at 118-119. First, the City argued that declining to apply Rule 403 to TNCs enhanced the availability and accessibility of cost-effective transportation. Id. at 119. Judge Gorton agreed that this was a legitimate policy goal, but noted that differential treatment in the two commercial enterprises in furtherance of that cited objective could be considered irrational. Id. Second, the City argued that it was rational to decline to regulate TNCs for the time being because any action on its part could have been preempted by future state legislation. Id. Judge Gorton held that this concern was speculative at best, and that given that the current definition of "hackney carriage" in Rule 403 included both taxis and TNCs, any new statute would probably require re-drafting of the regulations even if it did not create a new regulation scheme for TNCs. Id.

Defendants point out that despite Boston I, Judge Gorton later dismissed Plaintiffs' complaint in a December 21, 2016 order. Boston Taxi Owners Ass'n, Inc. v. City of Boston, No. CV 15-10100-NMG, 2016 WL 7410777, at *3 (D. Mass. Dec. 21, 2016) (hereinafter "Boston II"). This is accurate, but there is nothing in Boston II that changes the equal protection analysis laid out in Boston I, or even that would indicate a change in heart by Judge Gorton. Instead, Boston II turns on preemption and mootness grounds as a result of a subsequent enactment of legislation that took away the regulatory authority of the defendant municipality regarding taxicabs and TNCs.

Defendants also pointed out at oral argument that Boston I was appealed to the First Circuit, and the appeal was dismissed. This is true. Boston Taxi Owners Ass'n, Inc. v. Evans, No. 16-1412 (1st Cir. Mar. 9, 2017). More specifically, the appeal was voluntarily dismissed by

11

Appellant as a result of the <u>Boston II</u> decision. This dismissal has no bearing on this case, and has no impact on the value of Judge Gorton's analysis in <u>Boston I</u> for the reasons discussed above.

Here, the Court will deny the Motion to Dismiss the Plaintiffs' Equal Protection Claim as a result of their allegation that PPA failed to take any "substantial" enforcement action against TNCs prior to the passage of Act 164. Plaintiffs here allege (Medallion Am. Compl. ¶¶ 34-35; 60-61) and introduced evidence at the Preliminary Injunction hearing, that PPA did take some measures against Uber and Lyft, which a jury might find contradicts PPA's assertion that they had no power to regulate TNCs. Plaintiffs' allegations of arbitrary disparate treatment, coupled with Plaintiffs' detailed allegations that taxis and TNCs are similarly situated, are sufficient to state a plausible Equal Protection Claim. Defendants' arguments to the contrary are largely factual in nature and do not warrant granting Defendants' Motion to Dismiss. To the extent that the Intervenor's equal protection claim is based on the same theory of liability, that claim will also be allowed to go forward. The Intervenor's claims that are not based on this theory will be dismissed.[5]

The parties should not interpret this finding as any conclusion on the merits. The Court reaches this decision because of this particular allegation, and the Court's reluctance to dismiss a Complaint when there are at least some facts, and a plausible theory, that might warrant relief in

---

[5] Intervenor's Count I contains this allegation, but the remainder of Intervenor's claims do not relate to this theory of the case, and will be dismissed. In particular, Intervenor advances claims that Act 164 is unconstitutional under an Equal Protection analysis. Intervenor has not alleged sufficient facts to make this claim plausible – as Act 164 was a legislative decision making distinctions between groups of transportation providers and is entitled to deference. <u>See</u> United States v. Walker, 473 F.3d 71, 77 (3d Cir. 2007) (noting that statutory decisions are entitled to deference and are presumed rational).

the nature of damages, which Plaintiffs seek under the 14th Amendment for denial of equal protection.

  b. Takings

Medallion Plaintiffs also assert a Takings Clause claim, alleging that the PPA's failure to enforce their apparent position that TNCs operated illegally in Philadelphia prior to the passage of Act 164 constitutes a taking of Plaintiffs' property by the PPA without the payment of just compensation. The Takings Clause of the Fifth Amendment (applied to state and local government through the 14th Amendment) prohibits the government from taking private property for public use without compensating the property owner. In re Trustees of Conneaut Lake Park, Inc., 855 F.3d 519, 525 (3d Cir. 2017). Takings can be either physical appropriations, or effectuated through regulation. Id. Physical appropriations are per se illegal unless the owner is compensated, while regulatory takings require more nuanced analyses. Id.

To state a claim under the Takings Clause, the Plaintiff must have a legally cognizable property interest that has been affected by the government action in question. Prometheus Radio Project v. F.C.C., 373 F.3d 372, 428 (3d Cir. 2004). Here, Plaintiffs contend that their medallions are an exclusive property right under Pennsylvania statutory law. Plaintiffs argue that this entitles them to an exclusive property right to (collectively) provide taxi service in Philadelphia. In response, Defendants rely primarily on the Boston I litigation, where Judge Gorton dismissed a similar claim brought under the Takings Clause. There, Judge Gorton held that while a license can be a property right; the taxi plaintiffs in that case did not have a property interest in *exclusive* operating rights. Judge Gorton reached that decision in part because the city of Boston could have issued additional medallions at any time, which would have similarly "diminished" the value of the medallions held by the plaintiffs.

As discussed in Plaintiffs' Surreply (ECF 87), and as argued by counsel at oral argument, Plaintiffs here point out that the legal landscape in Philadelphia is different than in Boston and in the other cities where similar lawsuits have been brought. Here, Plaintiffs argue that their property interest in exclusive operating rights is provided for by Pennsylvania Statute. In particular, Plaintiffs highlight that the number of taxi medallions available in Philadelphia is capped by Pennsylvania Statute. See 53 Pa. C.S. § 5711(c)(2).

The Court will deny Defendants' Motion to Dismiss as to Plaintiffs' Takings claim, as Plaintiffs have identified enough of a difference in the statutory structure in Philadelphia to give rise to a plausible allegation that the taxi owners had a property right in their medallions. As with the equal protection claim, the Parties should not interpret this finding as any conclusion on the merits. The Court reaches this conclusion largely due to the potentially unique structure of Pennsylvania Law and because of the standard of review at this stage.

   c. Qualified Immunity

In addition to Defendants' arguments regarding the sufficiency of Plaintiffs' and Intervenor's complaints, Defendant Vincent Fenerty asserts a qualified immunity defense. Defendant Fenerty argues that he is entitled to protection from this lawsuit under the qualified immunity doctrine because his "conduct [did] not violate clearly established statutory or constitutional rights." Def. Br. at 32 (citing Pearson v. Callahan, 555 U.S. 223, 231 (2009)). In response, Plaintiffs argue that Fenerty is not entitled to qualified immunity, citing Boston I. See Pl. Br. at 21. There, Judge Gorton declined to afford qualified immunity to the individual government official defendants because the right to equal protection of the laws is clearly established.

The Supreme Court has held that because qualified immunity shields officers from suit, not just from trial, the district court should "resolve any immunity question at the earliest possible stage of the litigation." Anderson v. Creighton, 483 U.S. 635, 646 n. 6. However, the Third Circuit has warned that "it is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases." Newland v. Reehorst, 328 F. App'x 788, 791 n.3 (3d Cir. 2009); see also Garey v. Borough of Quakertown, 2012 WL 3562450, at *3 (E.D. Pa. Aug. 20, 2012) (Baylson, J.).

Taking Plaintiffs' allegations as true, as is required at this juncture, the Court is unable to hold that Defendant Fenerty is entitled to qualified immunity protection. Defendant Fenerty is free to reassert a qualified immunity defense at summary judgment or at trial.

## VI.     Conclusion

The Court is aware that there has been substantial exchange of documents already in this case. In addition, the Plaintiffs themselves are numerous in number and can testify at great length as to their own experiences if, and when trial is reached. As a result, the Court, at this time, will not require any further document production by either party. As outlined in the Order accompanying this Memorandum, the Court will allow some limited discovery, but will require the parties to complete any relevant discovery promptly. The Court will then set a schedule for Summary Judgment briefing.