**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Checker Cab Philadelphia, et al,<br>     Plaintiffs, | CIVIL ACTION |
|     v. | NO. 16-4669 |
| The Philadelphia Parking Authority and<br>Vincent Fenerty,<br>    Defendants. | |

## MEMORANDUM RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Baylson, J.                                                                                      **January 29 , 2018**

## I.    Introduction

Legal challenges by the taxicab industry to the advent of so-called Transportation Network Companies ("TNCs") such as Uber and Lyft are not new. This lawsuit, brought by taxi companies, does not seek to impose liability on TNCs themselves, but rather against the governmental agency responsible for regulating taxicabs in Philadelphia, the Philadelphia Parking Authority ("PPA"), for not doing more to combat TNCs before TNCs were legalized in Philadelphia.

Plaintiffs, Checker Cab Philadelphia and several hundred other medallion-holding taxi companies (collectively, "Checker"), seek damages from Defendant PPA and its former executive director, Defendant Vincent Fenerty, alleging their inaction toward TNCs violated the U.S. Constitution in two ways:

First, that PPA's failure to apply taxicab regulations to or otherwise regulate TNCs violated the Equal Protection Clause; and

Second, the diminution in value of taxi medallions caused by the failure to regulate TNCs constituted a taking of Checker's property without just compensation of law in violation of the Fifth and Fourteenth Amendments.

Checker initially sought damages, declaratory relief, and an injunction.

After this lawsuit was filed, the Court permitted intervention to Germantown Cab Company (Germantown), a non-medallion-holding taxi company serving several Philadelphia neighborhoods.

Defendants' motions for summary judgment as to both Checker and Germantown are presently before the Court. Checker and Germantown (collectively, the "Taxi Companies") have separately opposed these motions; both have also filed a motion pursuant to Rule 56(d) and a motion to file a supplemental memorandum.

## II. Background

### A. Regulatory Scheme and History

In 1947, the Pennsylvania General Assembly enacted the Parking Authorities Law ("PAL"), which created municipal parking authorities. Blount v. Philadelphia Parking Auth., 600 Pa. 277, 278 (2009). In 2004, the General Assembly amended Title 53 of the PAL to give the Philadelphia Parking Authority—as opposed to the Pennsylvania Public Utility Commission ("PUC")—the responsibility of regulating taxicab and limousine services in Philadelphia. See 53 Pa. C.S. §§ 5701–5745 (these statutes are commonly referred to as Act 94); Bucks County Servs, Inc. v. Philadelphia Parking Auth., 71 A.3d 379, 383 (Pa. Commw. Ct. 2013) ("Act 94 transferred jurisdiction over taxicab service within the City from the Commission to the Authority").

Specifically, Act 94 lists one of the "purposes and powers" of PPA as being "to act as an independent administrative commission for the regulation of taxicabs and limousine service." 53 Pa. C.S. § 5505(23). It further gives PPA the power to "prescribe such rules and regulations as it deems necessary to govern the regulation of taxicabs within cities of the first class under this chapter." 53 Pa. C.S. § 5722 (emphasis added); see also 53 Pa. C.S. § 5742 (using the same language to allow PPA to regulate "limousine service").

Act 94 defines "taxicab" as:

[a] motor vehicle designed for carrying no more than eight passengers, exclusive of the driver, on a call or demand service basis and used for the transportation of persons for compensation either on:

(1) A citywide basis as authorized by a certificate of public convenience and a corresponding medallion issued by the authority; or

(2) A non-citywide basis as authorized by a certificate of public convenience issued by the authority and without a corresponding medallion.

Act 94 defines "call or demand service" or "taxicab service" as:

Local common carrier service for passengers, rendered on either an exclusive or nonexclusive basis, where the service is characterized by the fact that passengers normally hire the vehicle and its driver either by telephone call or by hail, or both. The term does not include limousine service.

53 Pa. C.S. § 5701.

Under Act 94, medallions are defined as "property," which "cannot be revoked or cancelled by [PPA]." 53 Pa. C.S. § 5713. In addition, the statute limits the number of taxi medallions that can be issued by PPA; the statute initially capped the number of medallions at 1,600, with the possibility of issuing 15 additional medallions annually, up to a cap of 1,750. 53 Pa. C.S. § 5711.

In 2005, pursuant to Act 94 and its delegation of legislative authority, PPA promulgated its first set of taxicab and limousine regulations. 53 Pa. C.S. §§ 5722, 5742; Bucks County

<u>Servs., Inc.</u>, 71 A.3d 379, 383. In 2011, PPA promulgated the regulations that are currently operative. <u>See</u> 52 Pa. Code §§ 1011, <u>et</u> seq.

In November 2016, the Pennsylvania General Assembly passed legislation, known as Act 164, granting TNCs permanent legal authority to operate throughout Pennsylvania, including within Philadelphia. Act 164 added a new chapter to the Parking Authorities Law, entitled "Transportation Network Companies," which is codified at 53 Pa. C.S. §§ 57A01-22, and amended the definition of "taxicab service" or "call or demand service" in 53 Pa. C.S. § 5701 to exempt TNCs. 2016 Pa. Legis. Serv. Act 2016-164. Sections of the newly enacted Chapter 57A govern issues such as TNC licensure, insurance requirements, driver credentials, fare rates, and the like. 53 Pa. C.S. §§ 57A01-22. In addition, Act 164 lessens certain regulatory requirements on traditional taxicabs, and requires TNCs to pay assessments of 1.4% of gross revenues in Philadelphia to PPA. 2016 Pa. Legis. Serv. Act 2016-164. Act 164 also directs PPA to enact a new set of regulations governing for-hire transportation in Philadelphia that also governs TNCs. <u>Id.</u>

### B. Types of Taxicabs in Philadelphia

Checker and Germantown are owners of two different types of taxicabs operating in Philadelphia: "medallion taxicabs" (such as those operated by Checker), which may provide citywide taxicab service, and "partial-rights taxicabs," such as those operated by Germantown, which are not entitled to provide citywide service. 52 Pa. Code § 1011.2. Taxicabs may be ordered by telephone call or street hail. 53 Pa. C.S. § 5701 ("taxicab service "is characterized by the fact that passengers normally hire the vehicle and its driver either by telephone call or by hail, or both").

Checker Plaintiffs, who comprise over one hundred medallion taxicab companies including such recognizable companies as 215GETACAB, Crescent Cab, and Freedom Taxi, hold "certificates of public convenience…issued by PPA to own and operate Philadelphia medallion taxicabs" and possess "hundreds" of medallions in total. (Checker Am. Compl. ¶¶ 20-21.)

Intervenor Germantown Cab Company is a company operating partial-rights taxicabs. Germantown holds a certificate of public convenience from the Public Utilities Commission allowing it to provide taxicab service in various towns in Montgomery County, as well as the Philadelphia neighborhoods of Germantown, Mt. Airy, Roxborough, Manayunk, and Chestnut Hill. (Germantown Second Am. Compl ¶ 1, ECF 89; Germantown SOF ¶ 100, ECF 152-2.)

### C. Penalties for Unauthorized Taxicab Vehicles and Additional PPA Powers

In Philadelphia, vehicles "may not be operated as a taxicab with citywide call or demand rights…unless a certificate of public convenience is issued by the authority authorizing the operation of the taxicab and a medallion is attached to the hood of the vehicle." 53 Pa. C.S. § 5714(a)(1). Although the Parking Authorities Law does not define "authorized vehicle" or "unauthorized vehicle," the statute contains a section entitled "Certificate and medallion required" and sets forth penalties for "unauthorized vehicles":

> (f) Unauthorized vehicles.-- Operating an unauthorized vehicle as a taxicab, or giving the appearance of offering call or demand service with an unauthorized vehicle, without first having received a certificate of public convenience and a medallion is a nontraffic summary offense in the first instance and a misdemeanor of the third degree for each offense thereafter. The owner and the driver of a vehicle being operated as or appearing as a taxicab without a certificate of public convenience and a medallion are also subject to civil penalties pursuant to section 5725. Civil penalties which have been assessed and collected shall be deposited in the fund.

53 Pa. C.S. § 5714(f). The statute further empowers PPA to impound vehicles "utilized to provide call or demand service" in Philadelphia operating without a certificate of public convenience issued by PPA. 53 Pa. C.S. § 5714(g).

The statute also bestows upon PPA a number of more general powers to effect the purposes of the enacting statute, including the power to sue and be sued; to "investigate and examine the condition and management of any entity providing taxicab and limousine service"; to engage in all acts "necessary…to carry out the powers granted to the authority by this chapter or any other statute"; as well as to "prescribe such rules and regulations as it deems necessary to govern the regulation of taxicabs…under this chapter." 53 Pa. C.S. §§ 5505(2), (17), (24), 5722.

### III. Procedural History

On August 29, 2016, Plaintiff Checker Cab Philadelphia, Inc. and several hundred other medallion-holding taxicab companies filed this action. (Compl., ECF 1.) At that time, TNCs, most notably Uber and Lyft, had operated in Philadelphia for several years, but Pennsylvania had not yet enacted permanent legislation or regulations allowing TNCs to operate legally in Philadelphia, as discussed further below.

Checker asserted that PPA "arbitrarily violated [their] constitutional rights by applying burdensome and costly tariffs and regulations to Philadelphia taxicabs, while not equally taxing or regulating…Transportation Network Companies…which operate in Philadelphia as *de facto* taxis in direct competition" with Checker. (Compl. ¶ 4.) Checker further asserted that PPA had "unconstitutionally deprived Checker of their exclusive taxicab medallion property rights by allowing thousands of other vehicles to provide taxi service in Philadelphia despite not owning taxicab medallions." (Id. ¶ 11.)

On September 1, 2016, Checker moved for a temporary restraining order and a preliminary injunction. (Mot. for TRO and Prelim. Inj., ECF 2.)

Germantown moved to intervene on September 21, 2016. (Germantown Mot. to Intervene, ECF 20.)[1] Germantown did not file a separate motion for TRO and/or preliminary injunction. Germantown's motion to intervene was granted on October 4, 2016. (Order Granting Mot. to Intervene, ECF 41.)

The Court heard two days of testimony in conjunction with the preliminary injunction on September 28 and 29, 2016, and held oral argument the following week. (N.T. 9/28/17-10/4/17, ECF 50, 51, 53.) Checker presented six witnesses:

1) Robert Willis, who ran a business marketing advertisements on LCD screens on the tops of taxicabs;

2) Robert Familant, an employee of Progressive Credit Union, a major lender to the taxicab industry;

3) Frank Walker, a taxi driver;

4) Everett Abitbol, founder and owner of Freedom Taxi;

5) Khalid Alvi, a taxi driver; and

6) Inna Friedman, a taxi industry lender and medallion broker.

(N.T. 9/28/17, ECF 50.)

Defendants presented testimony from four witnesses:

1) Defendant Fenerty;

2) PPA General Counsel Dennis Weldon;

---

[1] Bucks County Services, Inc., which also holds a certificate of public convenience from the PUC and which provides taxicab services to Bucks County and part of northeast Philadelphia, also moved to intervene on September 19, 2016. (Bucks Mot. to Intervene, ECF 17.) Bucks County Services later voluntarily withdrew its Complaint, and is no longer before the Court. (Withdrawal, ECF 71.)

3) PPA Deputy Director of the Taxi and Limousine Division and Manager of Enforcement William Schmid; and

4) PPA Deputy Executive Director Corinne O'Connor.

(Id.; N.T. 9/29/17, ECF 51.)

Checker's witnesses testified to the extensive safety regulation and rising monetary assessments to which the taxicab industry was subject, as well as the decline in business and concomitant fall in medallion values since TNCs had arrived in Philadelphia. (Id.) Defendants' witnesses described the difficulties of enforcing the law against a popular, disruptive, and well-financed industry that by that time had been legalized in the remainder of the Commonwealth. (Id.)

The parties entered settlement discussions before Magistrate Judge Rice. Checker and Defendants (but not Germantown) reached agreement on several issues. (Tr. of Settlement Conference, ECF 66.) Defendants agreed that if then-pending legislation to legalize TNCs in Philadelphia were passed, PPA would immediately begin enforcing the requirements of that law; in return, Checker would withdraw the portion of the case requesting injunctive relief. (Id.)

On November 4, 2016—the day that the contemplated legislation, Act 64, was enacted—Checker filed a three-count Amended Complaint, its operative Complaint in this litigation, which did not seek injunctive relief. (Checker Am. Compl., ECF 70.)

Count I alleged that PPA had violated the taxi companies' equal protection rights by applying taxicab regulations and levying assessments against medallion-holding taxicabs but not TNCs. (Id. ¶¶ 113-122.)

Count II asserted that PPA's inaction toward TNCs had allowed TNCs to intrude on Checker's exclusive property rights in medallions, which amounted to a taking of private

property without just compensation in violation of the Fifth and Fourteenth Amendments. (Id. ¶¶ 123-138.)

Count III requested declaratory judgment on the equal protection and takings theories. (Id. ¶¶ 139-143.)

Checker also sought compensatory and punitive damages, interest, and attorneys' fees. (Id. ¶¶ 144.)

Germantown filed a five-count Second Amended Complaint, its operative Complaint, on January 4, 2017. (Germantown Second Am. Compl., ECF 89.)

Count I alleged that PPA had violated Germantown's equal protection rights by regulating and taxing them but not TNCs. (Id. ¶¶ 48-61.)

Count II alleged an equal protection violation because Germantown, and not TNCs, was subject to territorial restrictions in the wake of Act 164. (Id. ¶¶ 62-81.)

Count III asserted that the 1.4% annual revenue assessment on TNCs, 1% annual revenue assessment on medallion taxis, and the per-vehicle assessments on Germantown imposed as a result of Act 164 violated Germantown's equal protection rights. (Id. ¶¶ 82-93.)

Count IV alleged that Act 164 was unlawful special legislation. (Id. ¶¶ 94-111.)

Count V sought injunctive relief as to Act 164's alleged unconstitutionality. (Id. ¶¶ 112-22.)

Defendants moved to dismiss both operative Complaints for failure to state a claim. (Mot. to Dismiss Checker Am. Compl, ECF 74; Mot. to Dismiss Germantown Second Am. Compl., ECF 96.) Checker filed a memorandum in partial support of Defendants' motion to dismiss Germantown's Second Amended Complaint, in which it asked this Court to dismiss the

claims raised by Germantown that "exceed[ed] the scope of Plaintiffs' Amended Complaint and the relief requested therein." (Mem. in Partial Support of Defs.' Mot. to Dismiss, ECF 107 at 4.)

On June 6, 2017, the Court granted in part and denied in part the motions to dismiss. (Order, ECF 130.) The Court found that Checker and Germantown had stated a claim for an equal protection violation based on the theory that PPA had arbitrarily failed to regulate TNCs while enforcing regulations on traditional taxicabs prior to the enactment of Act 164 (Count I of the respective operative Complaints). (Mem. on Mot. to Dismiss, ECF 129.) In reaching this conclusion, the Court relied extensively on a district court decision from Boston finding that taxi companies had stated a claim on a similar failure-to-regulate theory, and distinguished other cases in which taxi companies had brought equal protection challenges to separate regulatory regimes for taxicabs and TNCs. (Id. at 9-11 (citing Boston Taxi Owners Ass'n, Inc. v. City of Boston, 180 F. Supp. 3d 108 (D. Mass. 2016)). The Court also allowed Checker's takings claim to proceed (Count II), noting that Pennsylvania law defined medallions as property and emphasizing the differences between the Pennsylvania statutory scheme and the regulations in Boston and other cities where courts had dismissed claims on similar takings theories. (Mem. on Mot. to Dismiss, ECF 129 at 14.)

While the Court allowed Germantown's arbitrary-failure-to-regulate equal protection claim to proceed (Count I), it dismissed the remainder of Germantown's claims because those claims (Counts II-IV) did not relate to the theory of the case brought by Checker. (Id. at 12 n.5.) The Court also noted that counsel for Germantown had stated at oral argument that it was no longer seeking prospective injunctive relief (Count V). (Id. at 5 n.2.) Finally, the Court denied Defendant Fenerty's qualified immunity defense. (Id. at 14-15.)

Thereafter, the parties engaged in substantial discovery, which included both written discovery, document discovery, and depositions. The Court required PPA and Germantown to make one or two individuals available, and Checker was to make between one and three individuals available, for depositions to be taken pursuant to Fed. R. Civ. P. 30(b)(6). (Order re: Discovery, ECF 146.)

At the close of discovery, Defendants moved for summary judgment. (Mot. for Summ. J. as to Checker, ECF 147; Mot. for Summ. J. as to Germantown, ECF 148.) Thereafter, Checker sought relief pursuant to Rule 56(d) to be permitted additional discovery on the grounds that Defendants' corporate designees had been insufficiently prepared for their depositions. (Mot. for Relief, ECF 150.) Germantown filed a short statement joining Checker's Rule 56(d) motion. (Mot. for Relief, ECF 151.) After summary judgment briefing was completed, Checker sought leave to file a supplemental memorandum to their opposition to summary judgment. (Mot. to File a Supplemental Mem., ECF 161.) Germantown filed a short statement joining this motion as well. (Mot. to File a Supplemental Mem., ECF 162.) The summary judgment motions, the Rule 56(d) motion, and the motion to file a supplemental memorandum are now ripe for decision.

Oral argument was held on January 24, 2018. The Court has considered the post-argument letters, which are docketed.

## IV. Defendants' Motions for Summary Judgment

Defendants filed separate motions for summary judgment as to Checker and Germantown. (Defs.' Mot. for Summ. J. as to Checker, ECF 147; Defs.' Mot. for Summ. J. as to Germantown, ECF 148.) Defendants also filed separate statements of undisputed facts as to Checker and Germantown in numbered paragraphs in accordance with this Court's rules. (Defs.'

Checker SOF, ECF 147-2; Defs.' Germantown SOF, ECF 148-2.)  The statements of facts, which are largely identical, describe PPA's statutory authority to regulate taxicabs, the operation of TNCs, enforcement efforts by PPA against TNCs, PPA's role in crafting legislation intended to legalize TNCs statewide, and that legislation's ultimate enactment.  (Id.)

In memoranda accompanying the motions to dismiss, Defendants argue that they are entitled to summary judgment on all theories advanced by Checker and Germantown.

### A. Taxi Companies' Equal Protection Clause Theories

With respect to both Taxi Companies, Defendants argue that they are entitled to summary judgment on the Taxi Companies' claims for violation of the Equal Protection Clause of the Fourteenth Amendment.  (Defs.' Mem. in Support of Mot. for Summ. J as to Checker ("Defs.' Checker Br.") at 27-64, ECF 147-1; Defs.' Mem. in Support of Mot. for Summ. J as to Checker ("Defs.' Germantown Br.") at 27-65, ECF 148-1.)  Defendants reproduce their briefing on the equal protection issues essentially verbatim in the two memoranda of law.  (Id.)

Defendants address the Taxi Companies' equal protection claims as presenting two theories:

1)  PPA arbitrarily failed to regulate TNCs in violation of the Equal Protection Clause; and

2)  PPA selectively enforced existing taxicab regulations on taxicabs, but not TNCs.

Defendants argue that they are entitled to summary judgment on the Taxi Companies' arbitrary-failure-to-regulate theory because numerous other courts—including the U.S. Court of Appeals for the Seventh Circuit, the Pennsylvania Commonwealth Court, and various other federal district courts—have held that TNCs and taxicabs are not similarly situated classes for purposes of the Equal Protection Clause in the context of failure-to-regulate equal protection

claims such as asserted in this litigation.  (Id.)  According to Defendants, the fact that TNCs and taxicabs are not similarly situated precludes any equal protection disparate treatment claim (such as the failure-to-regulate claim), and in any event, the Taxi Companies fail to meet their burden on rational basis review.  (Id.)

Defendants argue that they are also entitled to summary judgment on the Taxi Companies' selective enforcement equal protection theory for several reasons.  (Defs.' Checker Br. at 48-64; Defs.' Germantown Br. at 48-65.)  Proceeding from the position that TNCs were illegal taxicabs, Defendants contend that the only enforcement action PPA was legally allowed to take with respect to TNCs was to impound vehicles and issue citations.  (Defs.' Checker Br. at 50-51; Defs.' Germantown Br. at 50-51.)  Defendants next contend that taxicabs as legal market participants and TNCs as illegal market participants are not similarly situated, and the equal protection rights of legal market participants such as the Taxi Companies are therefore not affected by the amount of enforcement against illegal competitors.  (Defs.' Checker Br. at 50-52; Defs.' Germantown Br. at 51-53.)  Finally, Defendants assert that PPA did not act with an unlawful or discriminatory motive toward the Taxi Companies, as is necessary to support a claim for selective enforcement.  (Defs.' Checker Br. at 53-65; Defs.' Germantown Br. at 53-65.)

## B.  Checker's Takings Clause Claim

Defendants argue that they are also entitled to summary judgment on Checker's claim that PPA's failure to regulate TNCs amounted an unconstitutional taking of taxi medallions.  (Defs.' Checker Br. at 65-75.)  Although Defendants concede that Checker had a property interest in taxicab medallions, Defendants argue that any takings claim offered by Checker necessarily rests on the assumption that Checker had a right either to the value of a taxicab

medallion, or a right to exclude TNCs from the transportation-for-hire market itself. (Id.) Both of these premises, Defendants argue, have been universally rejected by other courts. (Id.)

## C.  Judicial Estoppel Claims

In a consolidated reply brief filed as to both Checker and Germantown, Defendants respond to the Taxi Companies' arguments regarding judicial estoppel. (Defs.' Consolidated Reply Br. at 3-5, ECF 158.) As discussed below, the Taxi Companies argue that PPA should be judicially estopped from arguing that TNCs and taxicabs are similarly situated classes by virtue of positions that PPA took before the Court of Common Pleas in litigation over citations on TNC drivers, Than My Trinh v. Philadelphia Parking Authority, 2016 WL 3566288 (Pa. Com. Pl. May 18, 2016). Defendants assert that the doctrine of judicial estoppel simply does not apply in this case because PPA had asserted a different legal position in the Court of Common Pleas litigation. PPA states it had previously asserted that TNCs were illegally providing call or demand service within the text of the statute and that position is not the same as Defendants' argument in this case that TNCs and taxicabs are not similarly situated under the Equal Protection Clause. (Defs.' Reply Br. at 3-5.) Defendants further assert that PPA did not take these positions in bad faith, as would be required for the Court to apply judicial estoppel. (Id.)

## V. Taxicab Companies' Responses

Checker and Germantown each separately oppose Defendants' motions for summary judgment.

## A.  Checker Arguments

### 1.  The PPA Statute

Checker begins its opposition to Defendants' motion for summary judgment with a review of the PPA statute in order to refute Defendants' argument that PPA's enforcement

powers relative to TNCs were limited to citations and impoundments. Checker lists many powers PPA enjoyed pursuant to 53 Pa. C.S. § 5505(d), including the ability "[t]o sue and be sued" and "[t]o do all acts and things necessary…to carry out the powers granted to the authority by this chapter or any other statute." (Checker Mem. in Opp. to Defs.' Mot. to Dismiss ("Checker Br.") at 30.) Checker then argues that TNCs provided "call or demand service" or "taxicab service" within the meaning of 53 Pa. C.S. § 5701, thereby bringing TNCs within the regulatory jurisdiction of PPA. (Id. at 33-38.) Checker argues that "[t]he breadth of § 5701's language afforded PPA the flexibility to regulate both foreseen and unforeseen actors that provided 'call or demand service,' such as partial-rights taxicabs, unauthorized service providers known as 'hack taxicabs,' and even TNCs." (Checker Br. at 34.) Thus, pursuant to the powers set forth by statute, PPA could have promulgated emergency regulations for TNCs or sought an injunction against the operation of TNCs in Philadelphia, but chose to do neither. (Id. at 31-32.)

## 2. PPA's Failure to Regulate in Violation of the Fourteenth Amendment Equal Protection Claim

In the next major section of its brief, Checker asserts that Defendants are not entitled to summary judgment on Checker's Fourteenth Amendment failure-to-regulate claim because, as a threshold matter, taxicabs and TNCs are similarly situated for purposes of the Equal Protection Clause—both taxicabs and TNCs provided "call or demand" service in the Philadelphia market. (Id. at 44.) In Checker's view, the fact that PPA enforced existing regulations against taxicabs but did not issue regulations for TNCs or seek an injunction against them constituted disparate treatment in violation of the Equal Protection Clause for which Defendants offered no rational basis. (Id. at 45-49.) Without much specificity, Checker asserts that genuine issues of material fact exist so as to defeat summary judgment. (Id. at 49.)

## 3. Checker's Selective Enforcement Claim

Checker then offers a brief alternative argument, largely devoted to distinguishing Defendants' case law support, that PPA's failure to regulate satisfied the elements for a selective enforcement claim under the Equal Protection Clause. (Id. at 49-53.) This argument will be discussed in greater detail, *infra*.

### 4. Checker's Takings Claim

Checker argues that PPA inaction toward TNCs caused substantial drops in taxicab medallion values, which "amount[ed] to a taking without just compensation" in violation of the Fifth and Fourteenth Amendments to the U.S. Constitution. (Id. at 56.) Unlike their counterparts in other cities, Philadelphia taxicab medallions are statutorily defined as "property" in 53 Pa. C.S. § 5713(a), and, as Checker would have it, therefore conferred "exclusive property rights." (Id. at 60.) Checker describes the PPA statute as "expressly provid[ing] that Philadelphia taxicab medallions possessed exclusive property rights that would be insulated from large-scale 'illegal' 'call or demand service' providers by its exclusive regulator – the PPA." (Id.) Because of the uniqueness of the Pennsylvania statutory scheme, Checker considers case law from other cities to be inapposite. (Id.)

Relying on the testimony of Robert Familant, an employee of a credit union involved in the taxi lending industry, who had testified in support of Checker at the preliminary injunction hearing, Checker also argues that PPA had approached medallion lenders to encourage them to lend in Philadelphia, and then destroyed that very lending market through inaction toward TNCs, which caused medallion values to plummet. (Id. at 59-60.)

### 5. The Taxi Companies' Claim re: Judicial Estoppel

Finally, Checker contends that PPA should be judicially estopped from arguing to this Court that taxicabs and TNCs are similarly situated by virtue of positions it took before the Court

of Common Pleas in appeals of PPA citations on private vehicle owners and impoundments of vehicles used for transportation for hire, without a medallion.  (Id. at 64-72.)  In one such case, PPA defended the citation and impoundment as follows in its brief:

> [Appellant]'s vehicle was being operated as an unauthorized service provider, and therefore subject to the Authority's jurisdiction. [Appellant] argues strenuously that Lac was operating not as a taxicab or limousine, but rather as a TNC which is not regulated by the Authority simply because the trip was booked using the UberX application on a cellphone, rather than the traditional telephone call or on-street hail. However using an alternate means of technology to secure the service does not redefine what the service is.
>
> Quite simply, [Appellant] allowed Lac to use her vehicle to hold himself out as a common carrier to transport individuals between two points in Philadelphia in a vehicle not authorized for such a purpose, with the expectation of receiving compensation for doing so. Regardless of the name ascribed to it…such activity is clearly in violation of the Parking Authorities Law and the Regulations.

(PPA Br. to Com. Pl. Ct. at 9, Ex. 16 to Checker Br., ECF 153-5.)  Thereafter, the Court of Common Pleas found that the service at issue was "simply a variant of a 'hack' taxi cab."  Than My Trinh v. Philadelphia Parking Authority, 2016 WL 3566288 (Pa. Com. Pl. May 18, 2016) at *1.  Rejecting the arguments that PPA was without jurisdiction, Judge Carpenter found the ride "was hailed via the UBERX phone app, which falls within the legislative definition of a 'telephone call' and a 'hail' and, thus, [the appellant's] vehicle was providing 'call or demand' taxi service. Such 'call or demand' taxi service within the City was provided without the requisite PPA certification."    Id. at *2.  Because the PPA had jurisdiction to enforce its regulations, the court upheld the fine.  Id.

Checker regards the above passage in the PPA brief to the Court of Common Pleas as a representation by PPA that TNCs and taxicabs provide the same service; thus, any argument made to this Court subsequent to its successful briefing represents a "bad faith change in

positions on taxicabs and TNCs." (Checker Br. at 65.) Checker requests that Defendants be estopped from asserting five legal positions:

(1)     The PPA lacked the statutory authority to regulate TNCs similarly to taxicabs under 53 Pa. C.S. § 5505(d) and 53 Pa. C.S. § 5701, et seq.
(2)     Taxicabs and TNCs are not similarly situated and direct competitors.
(3)     TNCs do not provide the same "call or demand service" as taxicabs under 53 Pa. C.S. § 5701.
(4)     The term "hail" is limited to street hails under 53 Pa. C.S. § 5701.
(5)     The fact that taxicabs rely primarily on street hails and TNCs rely e-hails [sic] to secure its riders is a valid basis for distinguishing the two entities.

(Id. at 66.)

In the alternative, Checker requests that PPA's change in position relative to TNCs be construed as an admission that genuine issues of material fact exist in this case: "PPA's contradictory and inexplicable 'about face' on its obligations to regulate TNCs creates genuine issues of material fact that must be decided by the jury." (Id. at 72.)

## B. Germantown Brief

### 1. Selective Enforcement

Germantown frames its equal protection challenge in terms of selective enforcement, which Germantown asserts it has "proven." (Germantown Br. at 7, ECF 152-1.)

As a threshold matter, Germantown sets forth some six reasons why Germantown, as a partial-rights taxicab company, is similarly situated to TNCs:

a.     Germantown is similarly situated to TNCs because the PPA's regulations do not permit Germantown to pick-up street hails outside of their territory in Philadelphia, yet prearranged rides are permitted, like Uber and Lyft.

b.     Germantown is similarly situated to TNCs because, like Uber and Lyft, Germantown maintains a certificate of authority issued by the PUC.

c.     Germantown is similarly situated to TNCs because, like Uber and Lyft, Germantown's certificate of authority issued by the PUC allows it the ability to offer its services on an exclusive and non-exclusive basis.

      d.  Germantown is similarly situated to TNCs because, like Uber and Lyft, Germantown also provides prearranged trips.

      e.  Germantown is similarly situated to TNCs because, like Uber and Lyft, when prearranged trips are dispatched by Germantown, the identity of the rider is made known to the driver of the dispatched taxi prior to the commencement of the trip.

      f.  Germantown is similarly situated to TNCs because Uber drivers at times pick-up anonymous passengers who have no contract with Uber.

(Id. at 11.)

Germantown next argues that, through PPA's failure to regulate TNCs, Defendants engaged in arbitrary and capricious action that "should not be entitled to governmental deference." (Id. at 15.) It argues that PPA could have issued regulations for TNCs pursuant to 53 Pa. C.S. § 5722—which allows PPA to promulgate rules and regulations "as it deems necessary to govern the regulation of taxicabs"—but failed to exercise its statutory authority. (Id. at 15-18.) In addition, PPA lacked any rational basis for its failure to promulgate TNC regulations or seek injunctive relief. (Id. at 18-19.) According to Germantown's reading of the record, agency decisions, and statutory authority, PPA employees witnessed but ignored illegal TNC activity in Philadelphia, and entrusted TNC enforcement to an inadequate enforcement team. (Id. at 19-23.) At the time that PPA was doing next to nothing to combat TNCs, "PPA did not hold back at its efforts in revoking Germantown Cab's certificate for public convenience" or "disputing a 2015 assessment approximating $250,000 that the PPA lodged on Germantown." (Id. at 24-25.)

Finally, Germantown asserts that when PPA vigorously enforced existing laws on Germantown at the same time as it failed to regulate TNCs, PPA acted with an improper motive—namely, in retaliation for Germantown's voicing its opposition to PPA policy, including by speaking up at public meetings and filing lawsuits against PPA. (Id. at 25-32.)

Together, these courses of conduct constituted "selective enforcement of [PPA's] regulations," which "should be found violative of Germantown's Equal Protection rights." (Id. at 32.)

### 2. Judicial Estoppel

Germantown also echoes Checker's argument that positions PPA took in appeals of citations on TNC vehicle owners and impoundments of TNC vehicles judicially estops Defendants from arguing that taxicabs and TNCs are not similarly situated. (Id. at 7-9.) Unlike Checker, Germantown did not request that these purportedly inconsistent litigation positions be construed as an admission that genuine issues of material fact exist. (Id.)

## VI. TNCs

The parties do not attempt to define Transportation Network Companies (TNCs) before proceeding to discuss the purported similarities or differences between taxicabs and TNCs.[2] The Court, however, infers from the submissions of all parties that TNCs are a business model through which customers must use a smartphone app to arrange transportation from a driver, who picks up and transports a passenger, usually in the driver's personal vehicle. Compensation is handled by requiring the customer to "register" a credit card with the TNC's website, which then makes a charge for the ride on the customer's credit card. No cash is accepted unless the customer voluntarily gives the driver a gratuity. (Defs.' Checker SOF at ¶ 22; Checker Br. at 16, 33; Germantown SOF ¶ 22.) Two well-known TNCs are Uber and Lyft. (Defs.' Checker SOF at ¶ 22; Checker Br. at 1; Germantown Br. at 11.)

---

[2] Current law defines "Transportation Network Company" as "[a] person or entity that obtains a license to operate a transportation network service by the authority and uses a digital network to facilitate prearranged rides." 53 Pa. C.S. § 57A01.

Defendants make several contentions about the operation of TNCs, which emphasize the differences between taxicabs and TNCs, that the Taxi Companies dispute.

Defendants assert that TNCs may not accept "anonymous street hails"—i.e., a raised hand—and that the identity of a TNC rider is known to a TNC driver. (Defs.' Checker SOF ¶ 22, 26; Defs.' Germantown SOF ¶ 22, 26.) Germantown states that it is possible for a passenger to hail a TNC anonymously if a third party arranges a ride. (Germantown SOF ¶ 23.)

Checker denies Defendants' assertion that TNCs do not accept cash, but instead require payment through an app user's verified credit card. (Defs.' Checker SOF ¶ 24; Defs.' Germantown SOF ¶ 24.) Checker denies this, but offers no facts of its own. (Checker SOF ¶ 24.) Germantown claims that it is possible to pay for an Uber ride via gift certificate. (Germantown SOF ¶ 24.)

Defendants assert that TNC drivers often work part-time to earn supplemental income, drive their own private vehicles, and put less wear and tear on those vehicles by driving fewer miles. (Defs.' Checker SOF ¶ 26; Defs.' Germantown SOF ¶ 26.) The Taxi Companies deny this without providing additional facts. (Checker SOF ¶ 26; Germantown SOF ¶ 26.)

Defendants assert that TNCs "serve a customer base which desires to use only a smartphone to complete the entire transaction, including arranging and paying for the trip, with no need for cash or credit cards, and which has come to expect timely responsiveness which taxicabs have not historically provided, particularly outside urban centers." (Defs.' Checker SOF ¶ 27; Defs.' Germantown SOF ¶ 27.) Checker notes that taxicab companies also allowed customers to order taxis through apps even before the arrival of TNCs in Philadelphia. (Checker SOF ¶ 27.) Germantown denies knowing whether this statement is correct. (Germantown SOF ¶ 27.)

Overall, to the extent that the operations of TNCs are relevant to the issue of "similarly situated" under the Fourteenth Amendment Equal Protection Claim, the disputes about TNCs are not material. The Court can take judicial notice that TNCs are a novel transportation service made possible by digital technology that did not exist until, approximately, the last five years but TNCs have proven immensely popular with the public, particularly in an urban environment.

## VII. PPA Enforcement Efforts Against TNCs

### A. Undisputed Facts

#### 1. PPA enforcement and Legal Action in Philadelphia

At the time TNCs began operating in Philadelphia, Pennsylvania law did not make any explicit provision for TNCs. At oral argument, both the Taxi Companies and PPA agreed that TNCs were operating illegally in Philadelphia until Act 164 came into effect.

Between October 14, 2014, and June 2016, PPA impounded one hundred TNC vehicles, which were towed at a cost of $1,000 each to recover. (Defs.' Checker SOF ¶ 51; Checker SOF ¶ 51.) PPA also issued "hundreds" of citations of $1,000 to TNCs and drivers. (Defs.' Checker SOF ¶ 51; Checker SOF ¶ 51.)

PPA filed administrative complaints before its own adjudicative body against Uber in August 2015 and against Lyft in January 2016, seeking fines of $1,000 for each day that those companies operated illegally in Philadelphia. (Administrative Complaints, ECF 147-13.)

On June 6, 2016, PPA, Uber, and its wholly owned subsidiary Rasier-PA executed a "Settlement Agreement and Mutual Release" in which PPA agreed to "cease all impound and enforcement actions" until September 30, 2016 against drivers for those TNCs and to stay all matters involving drivers and/or the parties to the agreement in exchange for payment, pending

the legalization of TNCs in Philadelphia. (Temporary Settlement Agreement, ECF 147-13 at 23-29).

PPA did not file any court action seeking to enjoin the operation of TNCs in Philadelphia or promulgate regulations governing TNCs prior to the enactment of Act 164 on November 4, 2016. (Defs.' Amended Responses to Checker's Requests for Admission ¶ 14, ECF 153-8.)

However, taxicab companies filed a lawsuit in 2014 seeking injunctive relief against Uber, which asserted claims of unfair competition, false advertising, and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO). Checker Cab Philadelphia, Inc. v. Uber Techs., Inc., No. CIV.A. 14-7265, 2015 WL 966284, at *1 (E.D. Pa. Mar. 3, 2015). PPA was not a party to this litigation. Id. The district court denied an injunction on the unfair competition claims:

> Plaintiffs premise their unfair competition claims on Defendants' alleged violation of various state and local laws and regulations pertaining to the operation of taxi cab services in Philadelphia. Indeed, Plaintiffs acknowledge as much in their brief: "The gravamen of Plaintiffs' Complaint is that the Uber defendants are operating an illegal gypsy cab operation in the City of Philadelphia in violation of law and regulation." [ECF 12 at p. 6].

> Therefore, with respect to the injunctive relief Plaintiffs seek for their state unfair competition claim, this Court finds that these issues are best left to the state and local legislative bodies and regulatory authorities charged with implementing and enforcing the ordinances and regulations that Plaintiffs here seek to enforce by way of private litigation...Plaintiffs...have fallen far short of demonstrating a likelihood of success on the merits of their unfair competition claim as needed to obtain a preliminary injunction.

Id. *4. The Third Circuit affirmed. Checker Cab of Philadelphia Inc. v. Uber Techs., Inc., 643 F. App'x 229 (3d Cir. 2016).[3]

---

[3] The litigation continued on damage claims. Judge Alejandro dismissed most of the remaining claims. Checker CAB Philadelphia, Inc. v. Uber Techs., Inc., No. CV 14-7265, 2016 WL 950934 (E.D. Pa. Mar. 7, 2016). The taxicab companies appealed the dismissal of the unfair competition claims only. The Third Circuit affirmed this order. Checker Cab Philadelphia, Inc.

## 2. Legalization of TNCs Outside Philadelphia and PPA Lobbying Efforts

On November 13, 2014, approximately one month after Uber had commenced Philadelphia operations, the Public Utilities Commission granted Rasier-PA, a wholly owned subsidiary of Uber, experimental authority to operate in most counties of Pennsylvania. (Application of Rasier-PA, ECF 147-14.) The PUC decision explicitly did "*not* authorize Rasier-PA to provide experimental service originating or terminating at points in the City of Philadelphia." (Id. at 78 n.25) (emphasis original).

PPA was involved in efforts to craft legislation that would legalize TNCs across the Commonwealth, including Philadelphia. (Defs.' Checker SOF ¶ 64; Defs.' Germantown SOF ¶ 65; Checker SOF ¶ 64; Germantown SOF ¶ 65.) On June, 11, 2015, Defendant Fenerty testified before the Consumer Affairs Committee of the Pennsylvania House of Representatives:

> TNCs currently operate in Philadelphia. At the end of the day, a TNC is a vehicle that picks up a customer upon request, drives that customer to a desired destination and charges a fee to do so. TNCs may use newer technology to arrange and pay for transportation services, but the service they provide is indistinguishable from that which has long been provided by other for hire services providers…
>
> While the growth of TNCs may reduce customer volume for other service providers in certain markets, if all providers are operating on a level regulatory

_____

v. Uber Techs., Inc., 689 F. App'x 707, 709 (3d Cir. 2017). Judge Rendell's non-precedential opinion upheld the district court's reasons for granting Uber's motion to dismiss the unfair competition claim because plaintiffs could not raise an unfair competition claim "premised on alleged violations of local laws and regulations." Id. at 709. The taxicab companies in that case had argued for an expansion of the district court's interpretation of Pennsylvania Unfair Competition law, which was rejected. The final paragraph of the opinion bears quoting:

> Because Checker's claims—rooted in alleged violations of state regulatory statutes—fundamentally differ from those sounding in unfair competition, we will uphold the ruling of the District Court. We find this result not only compelled by precedent, but, like other courts before us, preferable to having federal judges . . . interpret[ing] and enforce[ing] municipal regulations regarding taxi licensure.

Id. at 710 (quotations and citations omitted) (alterations original).

playing field, competition will dictate success.   Otherwise, an imbalance in competition will imperil further limousine advances and…major taxicab initiatives…

I would be remiss if I did not mention the Authority's frustration with the on-going illegal activities of Uber (through Uber "X") and Lyft in Philadelphia…Without legal precedent and over the Authority's clear prohibition, both Uber and Lyft have opted to launch illegal "for hire" vehicle transportation services in Philadelphia.

(Fenerty Testimony, Ex. 21 to Defs.' Checker Mot. to Dismiss, ECF 147-15.)   On February 4, 2016, PPA chairman Joseph Ashdale wrote a letter to Representative Bob Godshall, chair of the committee, in which Ashdale stated, "We have never concealed our objective, which is to reach consensus on a bill to legalize TNC's in a way that benefits Philadelphia's traveling public…for over a year the Authority has consistently supported the legalization of TNCs, if done properly. That position may not sit well with many taxicab and limousine owners in Philadelphia, but we believe it is the right thing to do for the public." (Ashdale Letter, Ex. 22 to Defs.' Checker Mot. to Dismiss, ECF 147-15.)

PPA was involved in negotiations with legislators, representatives of Uber and Lyft, and the City of Philadelphia as the legislation that became Act 164 progressed.  (Defs.' Checker SOF ¶ 64-68; Checker SOF ¶ 64-68.)

Act 164 was signed by Governor Wolf on November 4, 2016.  Act 164 added an entirely new Chapter 57A to the Parking Authorities Law, entitled "Transportation Network Companies," which is codified at 53 Pa. C.S. §§ 57A01-22, and amended the definition of "taxicab service" or "call or demand service" in 53 Pa. C.S. § 5701 to exempt TNCs.  2016 Pa. Legis. Serv. Act 2016-164.   The new sections of Chapter 57A contain sections governing TNC licensure, insurance requirements, driver credentials, fare rates, and the like.    53 Pa. C.S. §§ 57A01-22. As noted above, Act 164 also lessens certain regulations on taxi cabs, and requires TNCs to pay

assessments of 1.4% of gross revenues in Philadelphia to PPA. 2016 Pa. Legis. Serv. Act 2016-164.

## B. Disputed Facts

Although both Checker and Germantown assert a number of disputes of fact, the overarching dispute is essentially one of narrative. PPA portrays itself to this Court as an aggressive regulator doing its best, with limited resources, to carry out enforcement actions as it traditionally did. PPA emphasizes the challenges it faced in navigating the divergent interests of the taxicab industry, TNCs, the legislature, and the public. The Taxi Companies depict PPA as ineffectual at every turn in enforcing laws against TNCs—an enforcement effort they assert that the taxicab industry subsidized—and the PPA was all too eager to overlook flagrant violations of the law, even when personally witnessed by top PPA employees. The Taxi Companies detail the changing positions of PPA regarding TNCs, allege a "secret" deal between PPA and Uber in summer 2016, and imply that they were excluded from legislative efforts to craft TNC legislation.

Additional discussion of Checker's and Germantown's statements of undisputed facts, which both Checker and Germantown divide into two sections—first responding to PPA's facts and then adducing facts of their own—is set forth below. In many cases, Germantown denies Defendants' contentions without citing to facts in the record, and the Court will therefore discuss only those portions of the counter-statements of facts that contain record support. The Court will omit discussion of the statutory framework, which is discussed elsewhere in this memorandum.

The Taxi Companies dispute that PPA enforcement was the reason an early TNC, SideCar, left Philadelphia. (Checker SOF ¶ 28; Germantown SOF ¶ 36.)

The Taxi Companies deny that Uber began operating its UberX service in Philadelphia on October, 14, 2014.  (Checker SOF ¶ 29; Germantown SOF ¶ 29.)

Checker asserts that the limited relevant discovery period concerning TNC activity in this case is from October 2014 to the passage of Act 164 of November 4, 2016; however, Checker notes that Defendant Fenerty met with Uber executives prior to 2014, who advised Fenerty that they were coming to Philadelphia and refused to submit to regulation.  (Defs.' Checker SOF ¶ 29; Checker SOF ¶ 29.)

The Taxi Companies sharply contest PPA's assertion that "PPA took steps from the very outset to combat the illegal operations of TNCs."  (Defs.' Checker SOF ¶ 35; Checker SOF ¶ 35; Germantown SOF ¶ 36.)  Germantown asserts that "PPA did nothing to combat the operations of TNCs, but instead looked the other way while TNCs operated."  (Germantown SOF ¶ 36.) Checker asserts, with numerous citations, facts that PPA failed to take steps from the very outset to combat the illegal operation of TNCs, including the fact that PPA had previously met with representatives of TNCs, who had effectively put PPA on notice that TNCs would be expanding into the Philadelphia market.  (Defs.' Checker SOF ¶ 35; Checker SOF ¶ 35.)  Checker implies that part of the motivation was to seek approval from the TNCs that PPA would be a "friendly regulator"—although Checker does not specifically use that phrase.  Checker asserts that PPA "failed to seek injunctive relief against Uber to shut down the use of its smartphone app, which would have crippled its operations and forced them to submit to fair regulation."  (Checker SOF ¶ 37.)

Checker cites a number of other facts concerning Uber operations and PPA enforcement. (Checker SOF ¶ 41-44.)  While Checker cites to testimony regarding software Uber used to thwart regulators, it repeatedly mentions the fact that PPA failed to seek injunctive relief; in one

of many somewhat repetitive assertions, Checker asserts that "while PPA was swinging its regulatory hammer against taxicabs, its enforcement actions against TNCs were virtually non-existent." (Id.)

Checker denies PPA's statement that PPA "solicited the assistance of both taxicab medallion owners and drivers to provide new phones to create 'fresh' TNC accounts to continue these enforcement efforts," and asserts that PPA pushed all of its costs associated with regulating TNCs on to the taxicab industry. (Defs.' Checker SOF ¶ 45; Checker SOF ¶ 45.) Checker therefore implies that PPA increased the taxicabs' costs of doing business at the same time PPA's inaction allowed Uber to establish a foothold in Philadelphia and begin its marketing activity without any kind of regulatory oversight, let alone a regulatory oversight similar to what PPA was exercising against taxicabs.

Checker cites testimony from Defendant Fenerty that PPA refused to join a taxicab lawsuit against TNCs in this Court, Checker Cab Philadelphia, Inc. v. Uber Techs., Inc., No. CIV.A. 14-7265, 2015 WL 966284 (E.D. Pa. Mar. 3, 2015), described above. (Checker SOF ¶ 50.)

PPA and the Taxi Companies differ in their interpretation of the 2014 decision of the Public Utilities Commission on the application of Rasier-PA, a wholly owned subsidiary of Uber, to operate in much of Pennsylvania outside of Philadelphia. PPA reads the relevant language of the decision granting TNCs legal authority to operate in parts of the Commonwealth to mean that PPA had jurisdiction over TNCs whose starting point and ending point were both in Philadelphia. The Taxi Companies interpret that same language to mean that PPA could enforce the law against TNCs whose starting point or ending point was in Philadelphia. (Defs.' Checker SOF ¶ 47-48; Checker SOF ¶ 47-48; Germantown SOF ¶ 49.)

As a result of their respective readings of the PUC decision on TNCs outside of Philadelphia, the parties disagree as to whether PPA willfully overlooked or discounted the significance of Uber's violations of law or PPA regulations, particularly with respect to TNC vehicles operating at 30th Street Station in Philadelphia and Philadelphia International Airport whose point of origin or destination might be in a place where TNC service had been legalized. (Defs.' Checker SOF ¶¶ 51-61; Checker SOF ¶¶ 51-61; Germantown SOF ¶¶ 54-55.)  Checker quotes former Mayor Nutter about the failure of regulation over TNCs, because PPA was a state agency over which the City had no control.  (Checker SOF ¶ 62.)

Checker asserts that Defendant Fenerty was involved in drafting proposed TNC regulations in Harrisburg—which Defendants do not deny—and emphasizes that the taxicab industry criticized PPA for taking inconsistent positions on TNCs.  (Checker SOF ¶ 64-68.)

The parties characterize the implications of the "Settlement Agreement and Mutual Release" entered into between PPA, Uber, and its subsidiary Rasier-PA in sharply contrasting terms.  PPA describes the agreement as "a temporary agreement to help alleviate a temporary transportation crisis in Philadelphia – pursuant to which PPA agreed to temporarily stay enforcement for 90 days."  (Defs.' Checker  SOF ¶ 71; Defs.' Germantown SOF ¶ 72.) Germantown asserts that "[t]he PPA Uber Deal authorized Uber to provide citywide taxicab service in Philadelphia without complying with…53 Pa. C.S. §§ 5701-5745."  (Germantown SOF ¶ 81.)  Checker describes this agreement as a "secret deal" allowing Uber "to operate during the Democratic National Convention."  (Checker SOF ¶ 130.)

The Court finds that many of the Taxi Companies' additional facts overlap with the previous disputes over PPA's statement of undisputed facts.  (Checker SOF ¶ 79, et seq.)  Many

of the Taxi Companies' disputed facts also rephrase the main position of Checker that there are "no differences between taxicabs and TNCs." (Checker SOF ¶ 103; Germantown SOF 95-105.)

Checker describes PPA's communications with financial lenders concerning the taxicab industry, and the finances of PPA itself. (Id. ¶ 80-90.) According to Checker, PPA refused to endorse deregulation of the taxicab industry. (Id. ¶ 87.) Checker describes the increase and subsequent decrease of the value of taxicab medallions, which occurred at the same time as PPA increased its annual medallion assessments and fees on taxicabs. (Id. ¶ 88-89.) Finally, Checker implies that PPA's resources were not at all limited during the relevant time period, noting that PPA holds over $370 million in assets, including over $107 million in restricted cash and investments. (Id. ¶ 90.)

Checker makes many additional assertions about meetings with members of the Pennsylvania legislature or with Uber, and testimony given by Defendant Fenerty and others about the operations of TNCs. (Id. ¶ 91-96.)

### 1. Conclusion re Disputed Facts

For the reasons stated below, the Court finds that these disputed, or purportedly disputed, facts are either irrelevant to the principles of constitutional law governing this litigation, or insufficient to create a genuine issue of material fact that would defeat Defendants' motions for summary judgment.

The Taxi Companies have raised a number of issues as to whether PPA could have, or should have done, more to regulate TNCs as they were starting up their business operations in Philadelphia.

PPA asserts that that there are no material disputes of fact. The Court agrees. What PPA did or did not do is not in dispute. PPA's motivations, intent, and competence are disputed, but

these disputes are not relevant under established law. The Court has reviewed above the extensive argument and contentions about PPA's failures to act as it was arguably authorized to act, with regard to the advent of TNCs.

The Court can conclude, from the Taxi Companies' evidence taken in the light most favorable to the Taxi Companies, that PPA at times was ineffective, inconsistent, contradictory, and confusing—in its public conduct and in its statements made in various venues such as the testimony before the legislature, and in certain judicial proceedings. The Taxi Companies have also shown that at times PPA appeared conciliatory to the advent of the TNCs, knowing that their growing popularity among the public posed a threat to the economic vitality and viability of taxicabs.

## VIII.   Legal Standard

Summary judgment is appropriate if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.

A party seeking summary judgment bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325.

Summary judgment is appropriate if the non-moving party fails to rebut the motion by making a factual showing "that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

## IX. Equal Protection Claims

Ultimately, this action concerns the Taxi Companies' accusation that PPA effectively—and unconstitutionally—stood by while TNCs destroyed their business. Does the Constitution entitle the Taxi Companies to damages?—That is the question at the heart of this lawsuit.

The Taxi Companies assert two theories by which PPA's failure to regulate TNCs violated the Taxi Companies' rights under the Equal Protection Clause of the Fourteenth Amendment: the failure to regulate TNCs amounted to disparate treatment of "similarly situated" providers of transportation-for-hire services, and PPA selectively enforced existing taxicab regulations.

### A. Disparate Treatment

The Fourteenth Amendment to the U.S. Constitution prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Supreme Court has described the Equal Protection Clause as "essentially a direction that all persons similarly situated should be treated alike." City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). "An essential element of a claim of selective treatment under the Equal Protection Clause is that the comparable parties were similarly situated"—namely, that "they are alike in all relevant aspects." Startzell v. City of Philadelphia, Pennsylvania, 533 F.3d 183, 203 (3d Cir. 2008) (quotations and citations omitted). The parties agree that rational-basis review applies in this case. (Defs.' Checker Br. at 31; Checker Br. at 41.) Under rational basis

review, "the burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis" for the disparity in treatment. Bd. of Trustees of Univ. of Alabama v. Garrett, 531 U.S. 356, 367 (2001).

Checker, which asserts a disparate treatment theory, complains that Defendants failed to take meaningful enforcement action while enforcing burdensome regulations against existing taxicabs. (Checker Br. at 21-24.) As discussed above, Checker repeatedly asserts that taxicabs are similarly situated to TNCs, and that PPA could have and should have sought an injunction against the operation of TNCs, but chose not to; furthermore, PPA failed to advance any rational basis for its inaction. (Id. at 41-49.)

In response, Defendants urge this Court to adopt the reasoning of the Seventh Circuit and numerous district courts throughout the country, which have ruled against taxicab companies bringing equal protection claims against regulators for failure to regulate TNCs. Defendants characterize these decisions as having uniformly concluded TNCs and taxicabs not to be similarly situated for purposes of the Equal Protection Clause. (Defs.' Checker Br. at 34-39.)

Defendants rely principally on Illinois Transportation Trade Ass'n v. City of Chicago, 839 F.3d 594 (7th Cir. 2016) (Posner, J.), the only federal appellate case discussing an equal protection disparate treatment challenge by taxicab companies to regulators' treatment of TNCs. In that case, the plaintiffs, companies that owned and operated taxicabs or livery vehicles in Chicago and companies that provided services to taxicab and livery companies, alleged two claims for violation of the equal protection clause, which the district court discussed separately. Illinois Transportation Trade Ass'n v. City of Chicago, 134 F. Supp. 3d 1108, 1114 (N.D. Ill. 2015), aff'd in part, rev'd in part, 839 F.3d 594 (7th Cir. 2016). Count II alleged that Chicago taxi regulators lacked a rational basis for their initial failure to enforce taxicab regulations on

TNCs.  Id.  Count III alleged that a new city ordinance governing TNCs (known as TNPs) established an unconstitutional, two-tiered regulatory scheme that placed lesser regulatory burdens on TNCs through the ordinance than the city imposed on taxicabs through existing law. Id.  The district court found that taxicabs and TNCs were similarly situated, and denied the defendants' motion to dismiss on both equal protection claims.  Id. at 1115.

The Seventh Circuit reversed the district court's denial of the motion to dismiss the equal protection claims.  Judge Posner discussed the pre-ordinance claim for the city's failure to apply taxicab regulations and the post-ordinance claim challenging the separate regulatory frameworks as follows:

> The proper question to ask regarding equal protection is whether the regulatory differences between Chicago taxicabs and Chicago TNPs are arbitrary or defensible…Taxis but not TNPs are permitted to take on as passengers persons who hail them on the street. Rarely will the passenger have a prior relationship with the driver, and often not with the taxicab company either; and it makes sense therefore for the City to try to protect passengers by screening the taxi drivers to assure that they're competent and by imposing a uniform system of rates based on time or distance or both.

> So taxi service is regulated by the City of Chicago, but so is TNP service, though differently because the service is different from taxi service. A major difference is that customers, rather than being able to hail an Uber car, must sign up with Uber before being able to summon it, and the sign up creates a contractual relationship specifying such terms as fares, driver qualifications, insurance, and any special need of the potential customer owing to his or her having a disability.

> Unlike taxicab service Uber assumes primary responsibility for screening potential drivers and hiring only those found to be qualified, and the passengers receive more information in advance about their prospective rides—information that includes not only the driver's name but also pictures of him (or her) and of the car.

> Furthermore, the TNPs use part-time drivers extensively, and it is believed that these part-timers drive their cars fewer miles on average than taxicab drivers, who are constantly patrolling the streets in hope of being hailed; and the fewer miles driven the less likely a vehicle is to experience wear and tear that may impair the comfort of a ride in it and even increase the risk of an accident or a breakdown.

Id. (paragraph breaks added).  The court found "enough differences between taxi service and TNP service to justify different regulatory schemes," and that "the existence of such justification dissolve[d] the plaintiffs' equal protection claim."  Id.  Accordingly, the Seventh Circuit reversed the district court's denial of the defendants' motion to dismiss the equal protection claims.  Id. at 599.

At least one other district court has adopted the reasoning of Illinois Transportation and dismissed an equal protection claim by taxicab companies for the allegedly "intentional, irrational and unequal application" of taxicab and limousine rules prior to the enactment to a citywide TNC ordinance.  Newark Cab Ass'n v. City of Newark, 235 F. Supp. 3d 638, 645 (D.N.J. 2017).  The court relied heavily on Illinois Transportation to find that the "important differences" between taxis and TNCs, such as the fact that only taxicabs accept street hails and TNC passengers possess a preexisting contractual relationship to TNCs "justif[ied] different regulatory schemes."  Id. at 646-47.

Illinois Transportation has been equally influential in district court cases presenting equal protection challenges brought by taxicab companies against TNC ordinances themselves. District courts around the country have considered, and rejected, arguments to the effect that separate regulatory regimes for TNCs and taxicabs violate taxicab companies' right to equal protection.  See, e.g., Miadeco Corp. v. Miami-Dade Cty., 249 F. Supp. 3d 1296, 1302-04 (S.D. Fla. 2017) (dismissing taxicab companies' equal protection claim challenging bifurcated regulatory scheme for taxicabs and TNCs); Melrose Credit Union v. City of New York, 247 F. Supp. 3d 356, 369 (S.D.N.Y. 2017) (dismissing equal protection challenge on same theory); Boston Taxi Owners Ass'n, Inc. v. Baker, No. CV 16-11922-NMG, 2017 WL 354010, at *5 (D. Mass. Jan. 24, 2017) ("Boston II") (same); Desoto CAB Co., Inc. v. Picker, 228 F. Supp. 3d 950,

960 (N.D. Cal. 2017) (granting judgment on the pleadings on similar facts and legal theory); Gebresalassie v. D.C., 170 F. Supp. 3d 52, 55-68 (D.D.C. 2016) (dismissing taxi drivers' equal protection challenge to specific taxicab regulatory requirements, such as required vehicle color and dome light, to which TNCs were not subject).

### 1. Legal Principles Concerning "Similarly Situated"

There was extensive argument on the motions for summary judgment on the concept of similarly situated, which is a prerequisite for a claim under the Equal Protection Clause. At oral argument, PPA asserted that whether two parties are similarly situated is a question of fact and the Taxi Companies appeared to agree. However, Third Circuit opinions have held that this concept can be decided as a matter of law.

As noted above and at the argument, there are some disputes of fact in this case, but none of them are material to the legal issues. Considering the disputed facts in the light most favorable to the Taxi Companies, as the Court must do on a summary judgment motion by Defendants, no fact disputes warrant the Court denying summary judgment to PPA.

At oral argument, PPA counsel asserted that the determination of whether two entities are similarly situated is a question of fact. Counsel for the Taxi Companies did not disagree. The following citations warrant the Court's conclusion that the issue of whether two classes are similarly situated is fundamentally a legal issue which can be decided as a matter of law, and in numerous cases has been decided as a matter of law, which conclusions have been upheld by the Third Circuit. Yet, whether it is a factual issue or whether it is a legal conclusion, the result on the present record is that taxicabs and TNCs are not similarly situated.

The Third Circuit has in numerous cases delineated what it means to be similarly situated in the context of the Equal Protection Clause, and has approved a district court's determination

of whether two entities are similarly situated as a matter of law, including at the summary judgment stage. When presented with equal protection claims such as those in this litigation, district courts must decide whether two entities are similarly situated. Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 126 (3d Cir. 2002) (vacating partial grant of summary judgment in equal protection zoning case where the district court failed to address whether two land uses were similarly situated and remanding for determination of similarly situated issue).

For example, in Melrose, Inc. v. City of Pittsburgh, 613 F.3d 380, 382 (3d Cir. 2010), the Third Circuit affirmed a grant of summary judgment where the district court had found two companies not similarly situated. The plaintiff company asserted an equal protection violation on the basis of the Pittsburgh Zoning Board's rejection of a request to change the identification signs on buildings the company owned on the grounds that the proposed signs were actually advertising signs, which were prohibited in those locations. The plaintiff alleged that larger companies had been allowed to name other buildings as they wished and erect signs with "advertising aspects"—which announced the names of the buildings, such as Heinz Field, a football stadium—but those signs were nonetheless classified as identification signs. Id. at 393-94. The court held that the plaintiff company was not similarly situated to the other companies because the other companies had been in compliance with the relevant Zoning Board criteria for allowing a sign with advertising aspects as an identification sign, whereas the plaintiff company had not. Id. at 394.

The Third Circuit also affirmed the district court's grant of summary judgment to the defendants in Startzell v. City of Philadelphia, 533 F.3d 183 (3d Cir. 2008), in which a group of anti-gay protestors at an LGBT pride event alleged an equal protection challenge based on the fact that only the protestors, and not a group of event volunteers, were arrested. Id. at 203. In

the equal protection section of its opinion, the Third Circuit affirmed the ruling of the district court that the volunteers, who were present as part of a permitted event, were not similarly situated for First Amendment purposes to the protestors, who were simply "attendees with no relationship to the organizers." Id. The panel also affirmed the district court's ruling that the undisputed record evidence showed that the volunteers were not arrested for disobeying police orders because they, unlike the protestors, moved when threatened with arrest. Id. Because the two groups were not similarly situated, summary judgment was warranted on the equal protection claim. Id.

Just last year, the Third Circuit affirmed a grant of summary judgment on the grounds that the plaintiff and the proposed similarly situated class in an equal protection case were not actually similarly situated. Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs., 867 F.3d 338 (3d Cir. 2017). In that case a secular anti-abortion organization, whose primary purpose was "to provide 'life-affirming alternatives to abortion services,'" id. at 345, challenged the "contraceptive mandate" of the Affordable Care Act requiring employer-provided health insurance to include health insurance, but providing a limited exemption for houses of worship and their integrated auxiliaries." Id. at 342. The plaintiff organization, all of whose employees opposed abortion, brought an equal protection challenge, asserting that it was similarly situated to, but treated differently from, a house of worship that would be exempt from the contraceptive mandate. Id. at 348. The Third Circuit held that the organization was "in no way like a religious denomination or one of its nontheistic counterparts—not in structure, not in aim, not in purpose, and not in function"—and the two entities were therefore not "similarly situated;" accordingly, the panel held that the equal protection claim failed as a matter of law. Id. at 349-52.

## 2. Are Taxicabs and TNCs Similarly Situated?

In this case, the parties have had extensive opportunities to develop the facts but the Court concludes that the issue of "similarly situated" can be determined from the Undisputed Facts, and also taking the facts alleged by Checker and Germantown, in the light most favorable to Checker and Germantown.

The factual record supports a conclusion that the only common aspect between taxicabs and TNCs, at least in Philadelphia, is that they provide single ride transportation by a car and driver for a fee. Otherwise, the business models and legal status are substantially different.

First, the business model of the taxicab companies is substantially different than the business model of transportation network companies. Even if the governing statute, by reference to the "telephone" availability of both taxicabs and TNCs, were to be determinative, any similarity stops there. To start with, what is now called a "landline" telephone is totally useless to order a TNC vehicle. Only a person with a "smartphone," which most importantly operates on a wireless basis, without a telephone "wire" line, can engage a TNC vehicle. The smartphone combines both telephone communication plus other data such as the precise location of the customer, and the available vehicles in the customer's area. There is also a totally different payment model, as referenced above. The passenger does not pay the driver, but payment for the service will automatically appear on the passenger's pre-registered credit card. Although the Taxi Companies assert that some taxicabs can now be engaged on a basis similar to TNCs, the Taxi Companies have not made any showing this was a common practice prior to Act 164. Further, the fact that taxicabs now accept credit cards for payment does not make the two different business models "similarly situated."

Secondly, as noted above, the taxicab companies have been operating lawfully. However, until the effective date of Act 164, the TNCs were operating illegally in the

Philadelphia market. The fact that PPA did not act as aggressively as it might have, which the Court will accept as a fair statement that Checker and Germantown have proven, does not make the taxicab companies and the TNCs similarly situated. From the record in this case, this Court can only conclude, prior to Act 164, that the TNCs were making transportation available to the public in a widespread basis, but were not complying with existing legislation.

Third, the Court deems it significant that the Pennsylvania legislature enacted substantially new legislation specifically governing TNCs, rather than simply amending the existing law to authorize PPA to regulate TNCs in the same manner PPA was regulating taxicabs. The legislature therefore clearly considered TNCs to be a new form of for-hire transportation, separate and distinct from taxicabs. If the legislature had instead authorized PPA to regulate TNCs under the existing taxicab statutes, then Checker and Germantown would have a stronger argument that they were similarly situated to TNCs during the relevant period. However, Act 164, which separates TNCs and taxicabs into separate statutory chapters with separate legal requirements, reveals the extent to which the legislature acted and concluded TNCs and taxicabs should be treated differently.

Fourth, the Taxi Companies have offered no legal support for the proposition that a legal participant in a regulated market is "similarly situated" to an illegal participant in the same regulated market. The Taxi Companies have identified no case law in which a court has found that a legal market participant suffered a violation of the equal protection clause of the Fourteenth Amendment through the laxity of a regulator toward an illegal competitor, and this Court has found none. The Taxi Companies have not shown that regulated market participants may be awarded damages on the theory that a regulator did not take specific steps, such as seeking an injunction, to shut down illegal competition. Whether the PPA could have come

down harder on TNCs—for instance, by seeking an injunction or itself promulgating new regulations—and whether the Equal Protection Clause required it to have done so, are entirely different questions.

Lastly, the precedents cited above, such as <u>Illinois Transportation</u>, although not dealing with the specific facts in this case, are substantial authority for a legal conclusion that taxicabs and TNCs are not similarly situated.

One of the decisions cited above, <u>Melrose Credit Union</u>, specifically held that TNCs and taxicabs were not similarly situated. 247 F. Supp. 3d at 367 ("[q]uite simply, medallion taxicabs are not similarly situated to FHVs because medallion taxicabs, as alleged by Plaintiffs, have, effectively, a collective, government-sanctioned monopoly over one particular form of hailing").

### 3. Even if the Taxi Companies are Similarly Situated, PPA is Not Liable on a Disparate Treatment Theory

Assuming arguendo that taxicabs and TNCs are "similarly situated," the Court does not find genuine issues of facts that are material to the question of PPA's liability in this case, and settled law requires granting PPA's Motion for Summary Judgment.

Two courts have accepted the proposition that TNCs and taxicabs are similarly situated for the sake of argument, but nonetheless ruled for the defendant industry regulators on the grounds that "rational bases" exist to justify the different regulatory frameworks, or that the plaintiffs failed to meet their burden. <u>Boston II</u>, 2017 WL 354010, at *5 ("[e]ven taking as true all of plaintiffs' allegations that taxicabs and TNCs are similarly situated, plaintiffs have failed to negate all of the purported bases" for enacting state law governing TNCs but not taxicabs); <u>Desoto CAB</u>, 228 F. Supp. 3d at 960 (assuming, without deciding, that TNCs and taxicabs were similarly situated, but finding "a reasonably conceivable set of facts" to justify separate regulatory regimes).

At oral argument, counsel for Checker vigorously asserted that the Philadelphia situation is radically different, such that these decisions are not applicable in this case. As the Court noted in its Memorandum of June 6, 2017 denying Defendants' motion to dismiss (ECF 129), these cases concerned challenges to separate regulatory frameworks for taxis and TNCs, rather than failures to regulate TNCs as alleged here. Two other federal district court cases have found that taxicab drivers stated an equal protection claim where the plaintiffs alleged that authorities failed to regulate TNCs altogether.

In Boston Taxi Owners Ass'n, Inc. v. City of Boston, 180 F. Supp. 3d 108 (D. Mass. 2016) ("Boston I"), an association of taxicab owners argued that the city of Boston had arbitrarily failed to regulate TNCs, despite the fact that TNCs fell under the definition of taxicab in a Boston Police Department rule, Rule 403, as a "vehicle used or designed to be used for the conveyance of persons for hire from place to place within the City of Boston." Id. at 113. The plaintiffs alleged that the city had neither enforced existing taxicab rules against TNCs, nor promulgated new regulations for TNCs, despite the existence of a "Taxi Advisory Committee" charged with reviewing taxicab regulations in light of the entrance of TNCs to the for-hire transportation market. Id. at 113-14. On these facts, the court found that the plaintiffs had stated "at least a plausible claim that the Equal Protection Clause requires that" taxicabs and TNCs "be treated alike." Id. at 118. It continued:

> the Court finds persuasive plaintiffs' argument that many of the obvious differences between taxis from TNCs, such as the kind of vehicle used and the fact that taxicabs must be clearly labeled, are caused by the City's application of the requirements of Rule 403 to taxi operators but not to TNCs. The City may not treat the two groups unequally and then argue that the results of that unequal treatment render the two groups dissimilarly situated and, consequently, not subject to equal protection analysis. Such circular logic is unavailing.

> Other qualities cited by defendants fail to differentiate taxi operators from TNCs. Rides with taxis may now be requested and initiated through an app in an

identical manner to rides with TNCs. For instance, one TNC app, Uber, allows consumers to use the same platform to initiate a ride with either a TNC vehicle or a traditional taxicab. Similarly, both TNCs and taxicab operators accept credit cards as a form of payment. The fact that taxicabs also may initiate rides through street hails and accept other forms of payment does not necessarily mean they are dissimilarly situated to TNCs for the purpose of equal protection analysis. In fact, taxis and TNCs are clearly similarly situated in one important respect. They are both "hackney carriages" as the term is defined in Rule 403.

Id. Boston I did not definitively resolve the issue of whether taxicabs and TNCs were similarly situated; "[b]ecause several noticeable differences exist between taxis and TNCs the issue is not easily disentangled and is subject to reassessment as the transportation industry evolves apace." Id. The court further found that the reasons advanced by the city for not subjecting TNCs to Rule 403—the desire for cost-effective transportation and the possibility of state legislation that would preempt Rule 403—were not rationally related to the distinctions between TNCs and taxis. Id. at 119. Accordingly, the court denied the city's motion to dismiss the equal protection claim. Id.[4]

The other case to have allowed a failure-to-regulate equal protection claim to proceed comes from the unlikely transportation market of West Tisbury, Massachusetts, a town on the island of Martha's Vineyard, Baldwin v. Town of West Tisbury, No. 16-CV-10736-ADB, 2017 WL 3940932 (D. Mass. Sept. 7, 2017). The plaintiff, who was proceeding pro se, was the co-owner of a taxi company licensed by the town of West Tisbury. Id at *1. He became aware that "an Uber driver was operating in the Town without a license under the Town's taxi regulations," and that "a Lyft driver" began driving on Martha's Vineyard approximately a year later. Id. The

---

[4] After the Massachusetts state legislature enacted a law regulating TNCs at the state level, the court granted judgment on the pleadings, on the grounds that the defendants were preempted by state law from regulating TNCs; however, because "municipalities are liable only for their own illegal acts, defendants cannot be held liable for the conduct alleged in the complaint." Boston Taxi Owners Ass'n, Inc. v. City of Boston, 223 F. Supp. 3d 119, 123 (D. Mass. 2016) (citation omitted). The court did not revisit its earlier equal protection analysis. Id.

plaintiff, who had "implemented an electronic hailing system for his taxicab service that allowed real-time booking and payment by credit card through various smartphone apps," alleged that although TNCs fell within the town's definition of taxicab, the town refused to apply taxicab regulations to TNCs, even after his complaints to the town administrator, chief of police, and board of selectmen. Id. at *1-2. The court found that the plaintiff had "adequately pled that his taxicabs and the TNCs on Martha's Vineyard during this time period were similarly situated in all relevant respects"; because the court could not conclude that a rational basis existed for the disparity in treatment—and the town had not advanced any specific rationale—the court denied the motion to dismiss. Id. at *4. The court nonetheless noted that the plaintiff "likely face[d] an uphill battle" with his lawsuit. Id. at *5.

Neither Boston I nor Baldwin appears to have involved allegations by any party—that TNCs were operating illegally while the respective jurisdictions failed to apply existing taxicab regulations. Moreover, unlike the plaintiffs in Illinois Transportation and Newark Cab Association, Checker challenges not only PPA's failure to apply specific taxicab regulations to TNCs, but PPA's failure to do more to shut down TNCs altogether, specifically by seeking an injunction. Checker strongly argues that it was entitled to more aggressive legal action by PPA against TNCs.

Throughout their brief, Defendants argue that TNCs operated as unauthorized taxicabs without certificates of public convenience or medallions in violation of 53 Pa. C.S. § 5714. Construing the PPA statute, the Court of Common Pleas found that TNCs "simply a variant of a 'hack' taxi cab" providing "'call or demand' taxi service within" Philadelphia "without the requisite PPA certification." Than My Trinh, 2016 at *1, 2. Defendants focus on the differences between TNC and taxicab operations, which have been summarized at various points in this

Memorandum. The parties agree that the Taxicab Companies were operating legally, whereas TNCs were not, prior to Act 164.

As developed in the PPA brief, p. 45, and at oral argument, the "rational basis" test applies to determining whether PPA's conduct breached any obligation it had, as a regulator, to the taxicabs as the regulated industry. F.C.C. v. Beach Commc'ns, Inc., 508 U.S. 307, 313 (1993) ("[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification"); Brian B. ex rel. Lois B. v. Com. of Pennsylvania Dep't of Educ., 230 F.3d 582, 586 (3d Cir. 2000) (rational basis review is "ordinarily applied to social and economic legislation").

As long as PPA had a "rational basis" for its conduct, or lack of conduct, Checker's disparate treatment equal protection theory fails. Brian B. 230 F.3d at 588 (finding no equal protection violation where rational bases existed).

Third Circuit law is well settled that regulators, such as PPA, authorized by a specific state statute, have considerable discretion as to how to carry out its legislative mandate in regard to taxicabs, and also in its reaction to TNCs, which it considered as illegal entrants into the transportation business. Nazareth Hosp. v. Sec'y U.S. Dep't of Health & Human Servs., 747 F.3d 172, 180 (3d Cir. 2014) (upholding agency action on rational basis review).

Looking at the facts in the light most favorable to the Taxi Companies, the Court concludes that PPA's conduct, or absence of conduct, was well within in its discretionary rights, whether because of financial pressures, public sentiment, availability, or internal administrative decision making. PPA also had reason to anticipate that the Pennsylvania legislature would

enact legislation to regulate TNCs, which was preferable to all other alternatives.  The passage of the legislation justifies PPA's expectations.

PPA may have moderated its enforcement approach because it was aware that there was a great public acceptance of TNCs, and that the competition between TNCs and taxicabs was beneficial to the public.

PPA's regulation of taxicabs was, at least to some extent, safety-oriented and, as developed at the prior hearing on the Plaintiff's motion for preliminary injunction, there were good and sufficient reasons established on the record for many PPA regulations for safety of passengers, drivers, and other drivers on the highway.  Some regulations were economic in nature.  The Court urged PPA to reconsider these as putting a burden on taxicabs coping with the advent of TNCs.  This was a primary reason why the Court suggested that PPA and the taxicab industry mediate these economically based regulations before Magistrate Judge Rice, which resulted in a settlement of those regulatory issues, as a result of which the amended complaint, which is presently before the Court, only alleges damages.

## B.  Selective Enforcement

The Taxi Companies, especially Germantown,[5] also argue their arbitrary-failure-to-regulate theory under the doctrine of selective enforcement.  Germantown complains that PPA failed to seek a court injunction against the operation of TNCs or to promulgate TNC regulations while at the same time vigorously enforcing existing regulations against Germantown, such as the PPA's attempt in summer 2016 to revoke Germantown's certificate of public convenience for

---

[5] Checker barely briefs the selective enforcement issue, and mostly attempts to distinguish Defendants' case law on its facts.  (Checker Br. at 49-53.)  Checker then simply asserts that the PPA's inaction, which Checker repeats had no rational basis, constituted selective enforcement. (Id.)

failing to attend an inspection and its imposition in 2015 of a $250,000 assessment, which Germantown then later successfully challenged in court. (Germantown Br. 24-25).

Germantown further argues that the PPA acted with an improper motive because of Germantown's "exercise of its First Amendment Rights," such as filing lawsuits challenging the constitutionality of PPA rules and regulations, appealing citations, testifying against the PPA at hearings, and making public comments critical of the PPA and the PPA's lower assessments for medallion taxis at PPA board meetings and public meetings. (Id. at 25-32). Germantown further claims, in the selective enforcement section of its brief, that PPA's inaction constituted arbitrary and capricious agency action that is not entitled to deference, and lacked a rational basis. (Germantown Br. at 7-37.)

Defendants argue, correctly, that a selective enforcement theory does not fit the facts of this case. In particular, Germantown cannot proceed on a selective enforcement claim because legal market participants and illegal market participants are not similarly situated, and the record does not support that PPA acted with an improper purpose. (Defs.' Germantown Br. at 48-65.)

Indisputably, "[s]elective discriminatory enforcement of a facially valid law is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment." Jewish Home of E. Pa. v. Centers for Medicare & Medicaid Servs., 693 F.3d 359, 363 (3d Cir. 2012) (non-contemporaneous statement made by nursing home evaluator that she, as a Christian, would feel uncomfortable attending a ceremony with origins in Jewish ritual did not establish selective enforcement of nursing home guidelines). To assert a claim for selective enforcement, a plaintiff must show "(1) that [it] was treated differently from other similarly situated [entities], and (2) 'that this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor, … or to prevent the exercise of a fundamental right.'" PG Pub. Co.

v. Aichele, 705 F.3d 91, 115 (3d Cir. 2013) (quoting Dique v. N.J. State Police, 603 F.3d 181, 184 n. 5 (3d Cir. 2010)) (alterations original) (upholding dismissal of selective enforcement claim where plaintiffs alleged inconsistent application of law allowing news reporters and photographers access to polling places without discriminatory purpose).

Just weeks ago, the Third Circuit repeated its standard for selective enforcement:

> A plaintiff seeking to establish a selective enforcement claim must demonstrate (1) that he was treated differently from other similarly situated individuals; and (2) that this selective treatment was based on an unjustifiable standard, such as race, religion, some other arbitrary factor or to prevent the exercise of a fundamental right. Hence, to maintain a selective enforcement claim, a plaintiff must provide evidence of discriminatory purpose, not mere unequal treatment or adverse effect. A federal constitutional violation does not exist merely because of the exercise of some selectivity in enforcement.

Karns v. Shanahan, No. 16-2171, 2018 WL 358271, at *9 (3d Cir. Jan. 11, 2018) (internal quotations and citations) (affirming dismissal where plaintiffs arrested for preaching without permits on a train platform failed to identify similarly situated individuals in their complaint). Karns reaffirmed the context of a selective enforcement claim, that entities are similarly situated "when they are alike in all relevant aspects."  Id. at *9 n.9 (quoting Startzell v. City of Philadelphia, 533 F.3d 183, 203 (3d Cir. 2008)).

No Third Circuit case has ever held that establishing a rational basis, or a lack thereof, is a requirement to proceed on a selective enforcement theory.

Germantown has established the existence of bad blood between itself and the PPA, but no more.  The Taxi Companies clearly chafe at the regulatory burden imposed by the PPA, and resent that the PPA failed to "regulate" TNCs in some equally onerous way by promulgating regulations or seeking an injunction before the legalization of TNCs.  This argument construes a state agency's regulation in much too general and nebulous a way.  Requiring the PPA to enforce taxicab regulations on Germantown as harshly as on another partial rights operator—perhaps one

less vociferously opposed to the PPA—is one thing. Requiring the PPA to promulgate (potentially wholly separate) regulations for entities operating without certificates of public convenience or medallions, or to pursue equitable relief against their operation, is entirely another.

Unfortunately for the Taxi Companies, any attempt to pursue a selective enforcement theory on this record necessarily fails because TNCs and taxicabs are not similarly situated for the reasons discussed above.

One federal court has even dismissed a selective enforcement claim on the grounds that legal and illegal participants in regulated markets are not similarly situated. Desfosses v. Keller, 667 F. Supp. 2d 1210, 1221 (D. Idaho 2009). In Desfosses, the federal government had obtained injunctive and declaratory relief against an Idaho miner who had caused environmental damage in the course of operating a mine without an approved "plan of operations." Id. at 1213-14. The miner subsequently filed a pro se civil suit, claiming, among other things, selective enforcement. Id. The district court dismissed the selective enforcement claim because it did not consider "other mine operators" a similarly situated class, and the plaintiff had not pled that he had been treated differently from other mining operators who were not operating in compliance with the law, or who were subject to a court order enjoining their operations.

The Taxi Companies rely on decisions which correctly state the elements for selective enforcement, but are otherwise entirely inapposite to this case.

In Thomas v. Indep. Twp., 463 F.3d 285 (3d Cir. 2006), the court reversed the grant of a motion to dismiss where the plaintiff, a deli owner who sought transfer of a liquor license, alleged that town officials denied his applications and engaged in a campaign of harassment and misconduct "solely based upon [the plaintiff's] race and ancestry." Id. at 297.

United States v. Batchelder, 442 U.S. 114 (1979), a criminal case, did not even involve any allegations of selective enforcement; nonetheless, in a footnote, the Supreme Court merely stated that "the Equal Protection Clause prohibits selective enforcement 'based upon an unjustifiable standard such as race, religion, or other arbitrary classification'" before explicitly adding that the respondent "d[id] not allege that his prosecution was motivated by improper considerations." Id. at 125 n.9.

In Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005), a group of police officers had earlier sued to invalidate a residency ordinance for city employees; subsequently, some of the officers who had challenged the ordinance were discharged, while other non-resident employees kept their jobs. The discharged police officers filed suit, alleging retaliatory discharge in violation of the First Amendment and selective enforcement of the residency ordinance. The Third Circuit held that the First Amendment retaliatory discharge and selective enforcement allegations were "functionally identical," id. at 125-26, and considered the equal protection claim "derivative" of the retaliatory discharge claim. Id. When the court applied the three-part test for First Amendment retaliatory discharge of a public employee, it reversed the grant of summary judgment because it found issues of fact on the second two prongs of the test. Id. at 127-30.

Again, the Court is aware of no case that has held that, in a regulated market, more stringent regulatory oversight of legal participants than of illegal competitors constitutes selective enforcement—or an equal protection violation of any kind—much less awarded damages on such a claim. The Court declines to extend well established legal principles to find that legal participants in a regulated market are entitled under the equal protection clause to a particular level of enforcement against illegal market competitors, or to allow such regulated market actors to dictate the legal strategy by which a regulator combats illegal competition.

With regard to the selective enforcement claim, the evidence that the Taxi Companies have presented failed to supply the requisite proof required under settled Third Circuit standards for selective enforcement to an extent that it violates the Equal Protection Clause of the constitution.

Lastly, as more fully developed at the oral argument, there does not appear to be any case precedent where a regulator, such as PPA, has been held liable for damages under the Equal Protection Clause for either failure to regulate, or for excessive or inconsistent regulation, even as to similarly situated industry groups.

Thus, in conclusion, although the Court has made a legal conclusion that taxicabs and TNCs are not similarly situated, the Court alternatively finds, even assuming, *arguendo*, that they are similarly situated, that the Taxi Companies have failed to make any valid legal claims to establish that PPA is liable for damages to the Taxi Companies.

Defendants are therefore entitled to summary judgment on the Taxi Companies' claims under the Equal Protection Clause.

## X. Takings Claim

The Takings Clause of the Fifth Amendment, incorporated against state and local governments through the Fourteenth Amendment, forbids private property from "be[ing] taken for public use, without just compensation." U.S. Const. amend. V. Checker asserts that the drop in the value of taxicab medallions, and the associated collapse of taxicab medallion lending markets, caused by the PPA's failure to regulate TNCs amounted to an unconstitutional taking of their property.

In the Third Circuit, courts evaluating takings challenges ask three questions: first, whether a taking occurred; second, whether that taking was for public use; and third, whether the

claimant received just compensation.  In re Trustees of Conneaut Lake Park, Inc., 855 F.3d 519, 525 (3d Cir. 2017).  "Takings may occur either by physical appropriation of property or regulatory activity."  Id.  To assert a takings claim, a plaintiff "must first show that a legally cognizable property interest is affected by the Government's action in question."  Prometheus Radio Project v. F.C.C., 373 F.3d 372, 428 (3d Cir. 2004), as amended (June 3, 2016).

Checker pursues a regulatory taking theory: the PPA failed to take action to "insulate[]" medallion holders from illegal competitors and the concomitant instability in the market for taxi medallions.  (Checker Br. at 57.)  Checker contends that, in contrast to taxi medallion holders in other cities, Philadelphia medallion holders enjoyed "exclusive property rights" by virtue of state statute.  (Id.)  Despite the statutory definition of medallions as property, Checker asserts that the inaction of the PPA and proliferation of TNCs made their medallions worthless.  (Id. at 56-64.) Relying on the testimony of an employee of Progressive Credit Union, a company that lends to taxicab medallion holders, Checker argues that the inaction of the PPA unconstitutionally interfered with the expectations of medallion holders because it caused medallions to lose value, and credit to dry up in the lending market for taxi medallions. (Id. at 58-61.)

Defendants respond that regulatory takings theories regarding the diminution in value of taxi medallions and taxi companies' purportedly exclusive rights to engage in transportation for hire have been universally rejected, including in many of the cases cited above presenting equal protection challenges to disparate TNC regulation or arbitrary failure to enforce.  In particular, Defendants argue that Checker's arguments rest on the erroneous premises that taxicab medallion holders have a protected property interest either in the value of medallions or that their medallions confer a right to exclude competitors from Philadelphia transportation-for-hire market itself.  (Defs.' Reply Br. 65-75.)

Taxicab companies in other cities challenging either separate regulatory schemes for TNCs or arbitrary failure to regulate TNCs—in many of the cases discussed in preceding sections—have also attempted to assert violations of the Takings Clause. The takings theories in the other taxicab/TNC cases generally fall into two categories: (1) cases asserting that allowing TNCs to operate was an unconstitutional taking of taxicab owners' rights to provide transportation-for-hire services conferred by medallions, and (2) cases asserting that the reduction in medallion values caused by the entry of TNCs into the market was an unconstitutional taking.

As in the equal protection context, two leading cases are <u>Boston I</u> and <u>Illinois Transportation</u>. <u>Boston I</u> rejected the plaintiff taxicab owners' argument that the failure to regulate TNCs destroyed the taxicab owners "exclusive right to engage in the taxi business" that medallions purportedly conferred. 180 F. Supp. 3d at 117. Assuming property rights in the medallions for the sake of argument, the court found that medallions conferred "the right to exclude others from using his or her medallion," but that property interest did not extend to "a property interest in the transportation-for-hire market itself," and the medallion holders therefore lacked a property right "to exclude others from the market." <u>Id.</u> The same judge repeated this analysis verbatim in <u>Boston II</u>. 2017 WL 354010, at *4.

In <u>Illinois Transportation</u>, the Seventh Circuit, which cited <u>Boston I</u>, derided the plaintiffs' claim that "allowing the TNPs into the taxi and livery markets has taken away the plaintiffs' property for a public use without compensating them" as "weak." 839 F.3d at 596. Judge Posner continued:

> the City is not confiscating any taxi medallions; it is merely exposing the taxicab companies to new competition—competition from Uber and the other TNPs.

53

"Property" does not include a right to be free from competition… When property consists of a license to operate in a market in a particular way, it does not carry with it a right to be free from competition in that market…Taxi medallions authorize the owners to own and operate taxis, not to exclude competing transportation services. The plaintiffs…cannot exclude competition from taxicab newcomers, for the City has reserved the right (which the plaintiffs don't challenge) to issue additional tax medallions…All that the City gives taxi-medallion owners is the right to operate taxicabs in Chicago. That isn't a right to exclude competitive providers of transportation.

Id. at 596–97.  The court accordingly affirmed the district court's dismissal of the plaintiffs' takings claim.

Newark Cab Association, 235 F. Supp. 3d 638, and Miadeco, 249 F.Supp.3d 1296, discussed in the equal protection section above, rejected takings claims based on the decline in the value of taxicab medallions due to the arrival of TNCs in Newark and Miami-Dade County, respectively.  In Newark Cab Assocation, the taxicab companies asserted that the "value of both the medallions as well as the ability to operate exclusively within [Newark]" were property interests that had been compromised as a result of the arrival of TNCs.  235 F. Supp. 3d at 645 (alteration original).  The court accepted the proposition that taxicab medallions conferred property rights under New Jersey law, but identified a "meaningful distinction" between a precedent relied on by the plaintiffs in which a taxi owner was stripped of his license without proper process, and the case at hand, in which the plaintiffs "retain[ed] their medallions and taxi licenses albeit at a lesser value given the increased competition."  Id.  The court adopted the reasoning of a pre-TNC Eighth Circuit case, Minneapolis Taxi Owners Coal., Inc. v. City of Minneapolis, 572 F.3d 502 (8th Cir. 2009), to find that the plaintiff medallion holders did not possess a property interest in the value of their medallions.[6]  Id.  The court also cited Illinois

---

[6] Minneapolis Taxi Owners considered a takings claim by taxicab license holders who challenged a Minneapolis ordinance removing the cap on the number of taxicab licenses, thereby increasing the total number of licenses and reducing the value of the existing licenses.  572 F.3d 502.  The

Transportation for the proposition that taxi companies lacked the ability to exclude competing transportation services. Id. Because the plaintiffs "remain[ed] in possession of the medallions and there [was] no property interest in their market value," the court dismissed the plaintiffs' takings claim. Id.

Miadeco offered largely similar analysis, adopting the reasoning of Minneapolis Taxi Owners regarding the lack of a protectable property interest in the value of taxi medallions and quoting Illinois Transportation at length regarding taxi companies' inability to exclude competitors. 249 F.Supp.3d at 1304-05. The court ruled that the plaintiffs were "still free to lawfully conduct their taxicab businesses within the County, and there still exists a market for taxis. The medallions retain value, even accepting as true that the secondary market value of the medallions has decreased with the entrance of TNEs into the County's regulatory framework." Id. at 1305. The court therefore dismissed the takings claim. Id. at 1306.

Checker attempts to argue that the medallion system in Philadelphia is so different from that in other cities as to render this precedent inapposite. (Checker Br. at 58-61). It is undisputed that taxi companies have a legally cognizable property interest in the medallions they hold conferred by 53 Pa. C.S. § 5713(a), which defines taxicab medallions as property. There is no allegation that the government seized or confiscated medallions.

Checker's remaining arguments are unavailing. The purported differences between the taxicab medallion regimes in Philadelphia and in other cities—which often cap the number of medallions and sometimes term medallions "licenses" or "permits" rather than property—are less salient than Checker would have the Court believe. See, e.g., Joe Sanfelippo Cabs, Inc. v.

---

court found that the diminution in value of the existing licenses did not amount to an unconstitutional taking of private property on the grounds that "any property interest that the taxicab-license holders' [sic] may possess does not extend to the market value of the taxicab licenses derived through the closed nature of the City's taxicab market." Id. at 509.

<u>City of Milwaukee</u>, 839 F.3d 613, 614 (7th Cir. 2016) (number of "permits" formerly capped); <u>Miadeco Corp. v. Miami-Dade Cty.</u>, 249 F. Supp. 3d 1296, 1300 (S.D. Fla. 2017) (limited number of "licenses"); <u>Boston I</u>, 180 F.Supp.3d at 113 ("licenses" capped at 1,825). Some of the courts rejected takings challenges without even deciding the threshold question of whether the particular taxicab license conferred a property right. <u>See, e.g.</u>, <u>Minneapolis Taxi Owners</u>, 572 F.3d at 509 ("any property interest that the taxicab-license holders' [sic] <u>may possess</u> does not extend to the market value of the taxicab licenses derived through the closed nature of the City's taxicab market") (emphasis added); <u>Boston I</u>, 180 F. Supp. 3d at 117 (rejecting takings claim where the court assumed, without deciding, that a "license" conferred a property right).

Checker, like taxicab companies in other cities, ignores the distinction between property rights in a medallion—which the Pennsylvania legislature undoubtedly conferred—and property rights in the transportation market itself, which are nowhere mentioned in statute. Moreover, Checker's arguments, however originally couched in terms of credit markets and investment-backed expectations, ultimately rest on the same resoundingly rejected assumption of constitutionally protectable property interest in the value of the medallions. Checker essentially argues that it is constitutionally entitled to a liquid market in medallion lending—for which valuable medallions are a necessary predicate—a proposition for which it offers no legal support. This Court has found no legal precedent in which a medallion-holding taxi company survived a motion to dismiss on a comparable takings theory, much less received a damage award. In view of Checker's lack of support for this theory, and the overwhelming countervailing precedent, the Court finds that Defendants are entitled to summary judgment on Checker's takings claim.

## XI. Judicial Estoppel

The equitable doctrine of judicial estoppel serves to eliminate the unfair litigation advantage a party might obtain by litigating on one theory and then changing its position to "pursu[e] an incompatible theory." Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 314, 319 (3d Cir. 2003) (quoting Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 358 (3d Cir. 1996)). Judicial estoppel is a matter for the Court's discretion but may be applied only if all of the following criteria are met:

> First, the party to be estopped must have taken two positions that are irreconcilably inconsistent. Second, judicial estoppel is unwarranted unless the party changed his or her position in bad faith—i.e., with intent to play fast and loose with the court. Finally, a district court may not employ judicial estoppel unless it is tailored to address the harm identified and no lesser sanction would adequately remedy the damage done by the litigant's misconduct.

Montrose Med. Grp. Participating Sav. Plan v. Bulger, 243 F.3d 773, 779–80 (3d Cir. 2001) (internal quotations and citations omitted).

The Taxi Companies assert that Defendants are judicially estopped from arguing that taxicabs and TNCs are not similarly situated because of positions the PPA took before a Pennsylvania state court in appeals of TNC citations and impoundments. The Taxi Companies principally rely on Than My Trinh v. Philadelphia Parking Authority—to which Defendant Fenerty, notably, was not a party—in which the Court of Common Pleas upheld a PPA citation on a TNC driver. Than My Trinh, 2016 WL 3566288 at *2. In that case, the PPA advanced the following argument in its brief:

> [Appellant]'s vehicle was being operated as an unauthorized service provider, and therefore subject to the Authority's jurisdiction. [Appellant] argues strenuously that Lac was operating not as a taxicab or limousine, but rather as a TNC which is not regulated by the Authority simply because the trip was booked using the UberX application on a cellphone, rather than the traditional telephone call or on-street hail. However using an alternate means of technology to secure the service does not redefine what the service is.

Quite simply, [Appellant] allowed Lac to use her vehicle to hold himself out as a common carrier to transport individuals between two points in Philadelphia in a vehicle not authorized for such a purpose, with the expectation of receiving compensation for doing so. Regardless of the name ascribed to it…such activity is clearly in violation of the Parking Authorities Law and the Regulations.

(PPA Br. to Com. Pl. Ct. at 9, Ex. 16 to Checker Br., ECF 153-5).

The Court of Common Pleas accepted this position, ruling that the TNC service at issue was "simply a variant of a 'hack' taxi cab." Than My Trinh v. Philadelphia Parking Authority, 2016 WL 3566288 (Pa. Com. Pl. May 18, 2016) at *1. Rejecting the appellant's arguments that the PPA was without jurisdiction, the court found the TNC ride "was hailed via the UBERX phone app, which falls within the legislative definition of a 'telephone call' and a 'hail'" and, thus, [the appellant's] vehicle was providing "call or demand" taxi service. Such 'call or demand' taxi service within the City was provided without the requisite PPA certification." Id. at *2. Because the PPA had jurisdiction to enforce its regulations, the court upheld the fine. Id.

The Taxi Companies argue that the position PPA took in its brief forecloses Defendants from arguing to this Court that taxicabs and TNCs are not similarly situated. (Checker Br at 64-72; Germantown Br. at 7-9). Defendants respond that despite defending their enforcement actions, they never took the position that TNCs and taxicabs were not similarly situated for Equal Protection Clause purposes. (Defs.' Reply Br. at 3-5).

The Taxi Companies contend that PPA concedes that the differences between TNCs and taxicabs are merely incidental to the transportation service provided by both TNCs and taxicabs. (Defs.' Checker Br. at 45-48; Defs.' Germantown Br. at 45-48.) For example, Defendants assert that taxis and TNCs serve different customer bases, TNC drivers often work part-time and drive their own vehicles; and only taxicabs may accept anonymous street hails. (Defs.' Checker Br. at 45-46; Defs.' Germantown Br. at 45-46.) Defendants' position regarding incidental aspects of

TNC and taxicab service is not "irreconcilably inconsistent" with PPA's earlier statement that "using an alternate means of technology to secure the service does not redefine what the service is." (PPA Br. to Com. Pl. Ct. at 9, Ex. 16 to Checker Br., ECF 153-5).

Furthermore, there is no indication that Defendants argue either their former or current position in bad faith. Rather, they seek to persuade this Court to follow the lead of other courts considering equal protection challenges by taxicab companies against regulators, as in Illinois Transportation. Thus, the PPA's representations to the Court of Common Pleas do not meet the exacting standard for judicial estoppel, and the Court declines to impose such a penalty.

## XII.    56(d) Motion

After Defendants moved for summary judgment, Checker sought relief pursuant to Rule 56(d) on the grounds that Defendants' corporate designees were insufficiently prepared for their depositions, and requested either that summary judgment be denied or that they be allowed to take additional discovery. (ECF 150.) Germantown filed a brief statement joining this motion. (ECF 151.) The record shows that the PPA's corporate designees, Christine Kirlin and William Schmid, answered the questions they were posed, and provided testimony on the vast majority of the topics designated for deposition; in Schmid's case, three of the four remaining topics were withdrawn. (Kirlin Dep., ECF 150-1; Schmid Dep. 5-16, ECF 150-1.) The Taxi Companies have already received substantial discovery in this case. Although they clearly seek a greater understanding of why the PPA did not come down harder on TNCs, it is unclear how additional discovery would not create a genuine issue of material fact relevant to the Taxi Companies' claims. The motions for relief are therefore denied. At oral argument, the Taxi Companies failed to articulate any real need for this discovery as a prelude to the Court's decision on the pending motions for summary judgment.

**XIII.  Motions to File a Supplemental Memorandum**

Checker moved to file a supplemental memorandum in further opposition to Defendants' motion for summary judgment, which principally sought to add a PPA audit report as an attachment to the prior memorandum.  (Supp. Mem., ECF 161.)  Germantown filed a brief statement joining this motion.  (Supp. Mem., ECF 162.)  The PPA audit report contains a number of negative findings, none of which pertains to taxi regulation, medallions, or TNCs.  As such, the audit report is irrelevant to the claims in this lawsuit and the motions will be denied.

**XIV.  Defendant Vincent Fenerty's Claim of Qualified Immunity**

As previously noted, Vincent Fenerty, former Executive Director of PPA, was named as an individual defendant in this case, and moved to dismiss the complaint on the grounds of qualified immunity.  The Court denied the motion because no discovery had yet taken place, consistent with Third Circuit jurisprudence.  Mr. Fenerty also testified at the preliminary injunction hearing, and as the briefs note, he has authored many documents and also testified before the state legislature on issues involved in this case.  The Court believes that under settled Supreme Court and Third Circuit law, that Mr. Fenerty has a very strong legal argument that he is entitled to qualified immunity.  First, because the Court is rejecting the Taxi Companies' claims of constitutional violations, the Court believes it is likely proper to make the same conclusion as to Mr. Fenerty.  Alternatively, given the extensive discussion of law in this Memorandum and the very vigorous disputes over the applicable law, the Court is inclined to find that the applicable law was not "clearly established," at least in this factual context of PPA regulations and practices, emerging TNCs and their relationship to established taxicab companies.  This Court held in <u>Bradley v. West Chester University</u>, 26 F. Supp. 3d 435 (E.D. Pa. 2017), <u>aff'd on other grounds</u>, No. 17-1588 (3d Cir. Jan. 26, 2018), a defendant is entitled to

qualified immunity even if there is a factual dispute as to whether his conduct violated constitutional rights, if the right asserted was not "clearly established."  The extended discussion in <u>Bradley</u> would equally apply to this case.

At an earlier point in this case, the Court indicated that the motions for summary judgment should initially be determined as to PPA only.  Therefore, the Court, consistent with Rule 56 procedures, will give the Taxi Companies an opportunity to present facts the Taxi Companies still believe warrant the Court denying the Fenerty motion for qualified immunity, and by filing a brief memorandum of law citing to matters already in the record.

## XV. Conclusion

The economic plight of the taxicab industry has been extensively documented in the media as well as in economic journals.  TNCs have proven themselves to be immensely popular. The migration from taxicabs to TNCs, facilitated by the digital revolution, has caused severe hardship for many taxicab owners, operators, and drivers.  This suit reflects an effort by the taxicab companies to collect damages from PPA for the loss of income and diminution in the value of their assets.  The Court has concluded that the Taxi Companies' legal claims are without foundation under settled legal principles.  A court is not suited to protect market participants from competition, or from changing consumer preferences.  The marketplace still speaks loudly, probably louder than a court can, and the resolution of competitive combatants must take place in the marketplace, rather than in a courtroom.  The Court will **GRANT** summary judgment in favor of PPA, only, at this time.  The Court has considered the Taxi Companies' motions for additional filings and discovery, but finds these motions do not have merit in view of the discussion above.